[No. D010657. Fourth Dist., Div. One. Apr. 16, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN CLEAVES, Defendant and Appellant.

**COUNSEL**

Stephen J. Perrello, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Rudolf Corona, Jr., and Rhonda Cartwright, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WORK, J.**—John Cleaves appeals a judgment convicting him of second degree murder (Pen. Code,[1] § 187), primarily contending the court erred by failing to honor his request to instruct on a lesser related offense of aiding and abetting a suicide (§ 401). In addition, he argues we should fashion a lesser related offense of voluntary manslaughter for killings done at the request of the victim. Finally, he claims the trial court erred by omitting the phrase "high probability of death" when defining implied malice; failing to give involuntary manslaughter instructions; and failing to give proper instructions regarding the necessity of concurrence between mental state and act. For the following reasons, we find his contentions meritless and affirm the judgment.

I

■ A defendant's right to instructions does not turn on the court's assessment of credibility or the strength of the evidence. (*People v. Geiger* (1984) 35 Cal.3d 510, 531 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055]; *People v. Lemus* (1988) 203 Cal.App.3d 470, 477 [249 Cal.Rptr.

---

[1] All statutory references are to the Penal Code unless otherwise specified.

897].) The instruction should be given if the defense theory is supported by substantial evidence—which means evidence sufficient to deserve consideration by the jury, i.e., evidence from which a reasonable jury could find the existence of the facts underlying the instruction. (*People* v. *Lemus, supra,* 203 Cal.App.3d at p. 477.) Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the defendant. (*Id.* at p. 476.) Accordingly, to evaluate whether aiding and abetting suicide instructions were warranted on the facts presented to the trial court, we set forth Cleaves's version of the events in detail.

Cleaves was especially sensitive to the sufferings associated with AIDS. He was living with and helping a friend who was in an advanced stage of illness from AIDS.[2] Another of Cleaves's friends had died of AIDS. Around 3 a.m., as Cleaves was walking down the street, Eaton drove alongside and invited Cleaves to his apartment. At Eaton's apartment they twice engaged in sex over a period of hours. After they had sex, Eaton told Cleaves he had AIDS. During the day Eaton and Cleaves talked seriously about AIDS and death; Eaton telling Cleaves he had once tried to kill himself in New Orleans, and wanted to die. Eaton asked Cleaves how he looked, and when Cleaves responded he looked fine, Eaton told him he did not feel that way. Cleaves stayed with Eaton because he was concerned and was trying to help him. Eaton talked about the suffering a person goes through in the final stages of the illness, which he wanted to avoid.

Eaton talked of a service called the Black Mask that killed people with AIDS for money. Eaton offered various items of his personal property to Cleaves which he placed in the living room.[3] When Eaton stated he wanted to kill himself by strangulation Cleaves agreed to help him "do it." Later they knelt and prayed, and Eaton repeated his resolve to commit suicide.

Eaton tied a sash from his bathrobe around his neck, lay down on the bed, and asked Cleaves to tie his hands with the sash from his neck and to his feet. Cleaves tied Eaton's wrists behind his back with a belt, and tied the sash tautly from his neck to his wrists. Eaton bent his knees up, and Cleaves tied Eaton's feet to his hands with a soft sash or belt. Thus trussed, Eaton's body was arched with his feet in the air, his thighs still on the bed, with some distance between his feet and his hands. Eaton's face was down in a pillow. Eaton "pulled down"; and, when requested, Cleaves put his hands on Eaton's back to steady him on the bed. Eaton did not roll over on his side and Cleaves did not try to prevent him from doing so. Cleaves did not have to exert pressure to hold him down; his role was to steady him as he

---

[2] By the time of trial, his friend had died of AIDS.

[3] These included a pair of pants, two shirts, a jacket, a belt, a collar, a ring, some change, a pair of cuff links, a toiletry bag, and a teddy bear.

rocked up and down to prevent him from falling off the bed which Eaton feared would prevent him from completing the act of suicide. Eaton proceeded to strangle himself by "just straightening up," with his face staying down in the pillow.

When the sash slipped from Eaton's neck, Cleaves rewrapped it at Eaton's request and retied it to his hands. Cleaves never pulled on the sash or attempted to strangle Eaton; he did not exert pressure on the sash or on any tie; he did nothing to directly strangle Eaton; and he did not hold Eaton's face in the pillow. Eaton did not start choking when Cleaves tied the sash from his neck to his hands; rather Eaton began choking when he (Eaton) started "pushing" back on the sash with his hands and feet. Eaton was in sole control of how tight the sash was around his neck by straightening out his body with his feet.

Cleaves told the police that after the tie around his neck broke, he had to "extra hold him down," and he "laid on him." When asked by the police if he was helping Eaton out by putting enough weight on his back to where it started to choke him, because Eaton was not doing "it" himself, Cleaves answered, "yes." When asked if he put his full weight on Eaton, Cleaves told the police no, variously describing his conduct as placing his hands and pushing him down on the bed; just holding him down without putting a lot of weight on him; just holding him to keep him from bucking; holding him while standing along side of the bed; and holding him without putting any pressure on him.

At trial, Cleaves acknowledged that during police questioning, he had said when the neck sash came loose, he had to "extra hold him down," he "laid on him," and Eaton was not choking himself. He explained he meant Eaton was not choking himself because "that's where his arms were"; and he did not have to hold him down extra hard or lie on him; but when he was talking to the police he was confused and scared.

Cleaves acknowledged at trial that he knew Eaton was going to die when he tied him up; he wanted to help him die; and he knew if he did not tie him up and hold him on the bed he was not going to die.

After Eaton's death, Cleaves fixed himself a drink, put on a pair of pants and shoes Eaton had given him, and as Eaton had requested, took the bindings off Eaton and threw them away. Eaton had told Cleaves his wallet containing his automatic teller machine (ATM) card was in the glove compartment of his car, and had given Cleaves his ATM number. Cleaves took

the wallet and withdrew money from the ATM machine over the next three days. Because he did not drive, Cleaves had a friend pick up Eaton's car.

When arrested, Cleaves at first denied involvement in Eaton's death, insisting he fell asleep and woke up to find Eaton dead. After continued interrogation, Cleaves finally admitted he tied Eaton up and held him down. On the back of one of Eaton's personal business cards, the police found the words: "A.I.D.S. and the Doctors of Death, Dr. Alan Cartwell."

The coroner found a type of cancer in Eaton's intestines which indicated infection with the AIDS virus, but the quantity and smallness of the infected cells suggested Eaton would not have known he had the cancer or suffered from any symptoms. Eaton tested positive for the AIDS virus, but the coroner did not find evidence of any other illnesses. The cause of Eaton's death was determined to be asphyxia by ligature strangulation, as evidenced by ligature marks on his neck and wrists, abrasions on his lips, chin and nose, and biting of the lower lip and tongue. There was no other evidence of trauma to his body. The coroner acknowledged the ligature marks could be consistent with Eaton attempting to pull on his neck or strangle himself, noting it does not take much pressure to cause asphxiation, and it is possible for a person to strangle himself with a ligature tied from his neck to his wrists. On the other hand, the coroner stated a person lapses into unconsciousness prior to death during strangulation, and once unconscious it was doubtful the person could maintain the pressure necessary to cause the tension to a ligature from his neck to his wrists.

## II

*Failure to give aiding and abetting suicide instructions*

A defendant is entitled to a lesser related offense instruction when there is some basis on which the jury could find the lesser offense, when the offense is closely related to the offense charged and shown by the evidence, and when the defendant is relying on a theory of defense consistent with the lesser offense. (*People* v. *Geiger, supra,* 35 Cal.3d at p. 531.) Although the trial court allowed the defense to present evidence on its aiding and abetting suicide theory, it ultimately refused to instruct the jury on the lesser related offense.[4]

---

[4]The court reasoned the uncontroverted evidence showed Cleaves tied Eaton into a position from which Eaton could not escape and had to die; i.e., the choking would be caused by the method of tying up regardless of Eaton's intention. The court analogized to a situation where the victim would request death by smothering, and the defendant would nail the vic-

The trial court also refused to give manslaughter instructions.[5] Accordingly, the jury was instructed as to first and second degree murder only, and convicted Cleaves of the latter. Further, the trial court fashioned an instruction addressing the evidence pertaining to suicide as follows:

"There has been evidence that the defendant killed the victim at the victim's request. You are the exclusive judges of whether or not this is true and, if true, what impact it will have on your verdict. However, if you find beyond a reasonable doubt that the offense of murder in the first or second degree was committed by the defendant as defined in these instructions, it is immaterial whether the acts of the defendant were committed pursuant to an agreement with the victim."

Section 401 provides: "Every person who deliberately aids, or advises, or encourages another to commit suicide, is guilty of a felony."[6] As explained by our Supreme Court, the "key to distinguishing between the crimes of murder and of assisting suicide is the active or passive role of the defendant in the suicide. If the defendant merely furnishes the means, he is guilty of aiding a suicide; if he actively participates in the death of the suicide victim, he is guilty of murder." (*In re Joseph G.* (1983) 34 Cal.3d 429, 436 [194 Cal.Rptr. 163, 667 P.2d 1176, 40 A.L.R.4th 690].)[7] The statute providing for a crime less than murder " 'does not contemplate active participation by one in the overt act directly causing death. It contemplates some participation in the events leading up to the commission of the final overt act, such as furnishing the means for bringing about death,— the gun, the knife, the poison, or providing the water, for the use of the person who himself commits the act of self-murder. But where a person *actually performs, or actively assists in performing, the overt act resulting in death*, such as shooting or stabbing the victim, administering the poison, or holding one under water until death takes place by drowning, his act constitutes murder, and it is wholly immaterial whether this act is committed pursuant to an agreement with the victim . . . .' " (*People* v. *Matlock* (1959) 51 Cal.2d 682, 694 [336 P.2d 505, 71 A.L.R.2d 605], italics added.)

---

tim into an airtight box, under which circumstances the defendant would not be entitled to an aiding and abetting instruction by stating the victim chose to run out of air.

[5] The defense asked for voluntary manslaughter instructions on the theory Cleaves became enraged when he learned Eaton had AIDS; the court noted Cleaves very specifically said he did the killing to help Eaton die. After an initial position that involuntary manslaughter instructions were not appropriate, the defense later requested them, but the court found there was no evidence to support them.

[6] The felony is punishable by a state prison term of 16 months, 2 years, or 3 years (§ 18), whereas second degree murder is punishable by a term of 15 years to life (§ 190).

[7] *In re Joseph G.* declines to apply this active/passive distinction to a genuine suicide pact situation, where—although the defendant actively participates in the death—the suicides are undertaken simultaneously by a single instrumentality. (*Id.* at pp. 436, 440.)

In *Matlock*, the defendant put a cord around the victim's neck, the victim adjusted the cord, and the defendant choked him. (*Id.* at p. 689.) The court held aiding and abetting suicide instructions were properly refused since the defendant "actively strangled" the victim. (51 Cal.2d at p. 694.) ■ Here, viewing the facts most favorably to the defense, there are no facts which would support the requested instruction. Although Cleaves may not have applied pressure to the ligature itself, he admits his holding Eaton to keep him from falling off the bed was designed to assist Eaton to complete the act of strangulation. This factual scenario indisputably shows active assistance in the overt act of strangulation, and the instruction was not warranted.

*Fashioning of manslaughter crime for "mercy killing"*

■ Cleaves asks us to fashion a manslaughter crime for a killing done at the victim's request, based on the absence of malice, which does not now expressly exist under California law.[8] The same request was rejected in *In re Thomas C.* (1986) 183 Cal.App.3d 786, 799-800 [228 Cal.Rptr. 430]. As recognized by Cleaves, our Supreme Court in *People* v. *Matlock, supra*, 51 Cal.2d at page 694, defined a killing pursuant to an agreement with the victim as murder. Although *Matlock* does not address the absence of malice issue, as a lower tribunal we decline to deviate from the parameters of *Matlock*. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

We note *Matlock* distinguishes between the crimes of murder and aiding and abetting suicide, and does not discuss the issue of whether malice is negated so as to constitute manslaughter. Subsequent to *Matlock*, the Supreme Court in *In re Joseph G., supra*, 34 Cal.3d 429, summarized at length the modern status of the law pertaining to suicide and related crimes. *In re Joseph G.* observes under modern law suicide and attempted suicide are viewed as symptoms of mental illness and not crimes, and although some jurisdictions classify aiding and abetting suicide as manslaughter, most jurisdictions, including California, create a sui generis crime for aiding suicide, "removing it from the harsh consequences of homicide law and giving it a separate criminal classfication more carefully tailored to the actual culpabiilty of the aider and abettor." (*In re Joseph G., supra*, 34 Cal.3d at pp. 434-435.) Again, however, the analysis in *In re Joseph G.* focuses primarily on the distinction between murder and aiding and abetting suicide (with the court holding a defendant engaging in a simultaneous suicide

---

[8] It is interesting to note the trial court's instruction that the jury could judge the impact of the evidence that the defendant killed the victim at the victim's request, appears to suggest the jury could acquit if it believed the victim's request removed the element of malice from Cleaves's conduct so as to defeat the murder charge.

effort with a single instrumentality can be guilty of aiding and abetting rather than murder notwithstanding his active participation in the overt act causing death), and does not delve into the issue of whether malice is negated when the defendant kills the victim at the victim's request. *In re Joseph G.* does note that current law in California provides no options between the two extremes of murder at one end, and aiding and abetting suicide at the other, whereas under current English law, the survivor of a genuine suicide pact who actually kills the other person is guilty of manslaughter rather than murder. (*Id.* at p. 438 & fn. 7.)

In another context, our Supreme Court in *People* v. *Flannel* (1979) 25 Cal.3d 668, 677, footnote 3, 680 [160 Cal.Rptr. 84, 603 P.2d 1], emphasized the "vice is the element of malice; in its absence the level of guilt must decline," and recognized the courts may define a crime so as to give effect to the statutory definition of manslaughter when factors render the person incapable of harboring malice. *People* v. *Flannel, supra,* at page 677, holds that notwithstanding section 192's definition of voluntary manslaughter as being a killing upon a sudden quarrel or heat of passion, a crime is also reduced from murder to voluntary manslaughter when a person acts based on an unreasonable belief in the need for self-defense.

We leave it to our Supreme Court to resolve whether it is appropriate to examine the malice issue as it pertains to a killing at the victim's request.

*Omission of phrase "high probability of death" from definition of implied malice*

 Cleaves objects to the current definition of implied malice for murder in CALJIC Nos. 8.11 and 8.31, which no longer refer to an act "involving a high degree of probability that it will result in death," but rather refer only to an act for which "[t]he natural consequences . . . are dangerous to human life."[9] He asserts that implied malice requires an act involving a *high*

---

[9] The former versions of the CALJIC instructions defined implied malice and second degree murder as arising from "an intentional act, involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with a wanton disregard for human life or when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." (CALJIC No. 8.11; see also CALJIC No. 8.31 (4th ed. 1987 pocket pt.)

The current versions state in part:

"1. The killing resulted from an intentional act,

"2. The natural consequences of the act are dangerous to human life, and

*probability* of death, and it is not enough that the act be merely *dangerous* to human life.

First, we note in the context of addressing a different issue, the current language of CALJIC Nos. 8.11 and 8.31 was approved by our Supreme Court in *People* v. *Dellinger* (1989) 49 Cal.3d 1212, 1215, 1222 [264 Cal.Rptr. 841, 783 P.2d 200].[10] Moreover, contrary to Cleaves's suggestion, Supreme Court precedent does not establish that the term "high probability of death," as opposed to the phrase "dangerous to human life," has been utilized as the pivotal terminology to define implied malice. Rather, the two phrases have been used as alternative definitions for the same concept. (See, e.g., *People* v. *Watson* (1981) 30 Cal.3d 290, 296 [179 Cal.Rptr. 43, 637 P.2d 279]; *People* v. *Dellinger*, *supra*, 49 Cal.3d at pp. 1217-1219; *People* v. *Phillips* (1966) 64 Cal.2d 574, 587 [51 Cal.Rptr. 225, 414 P.2d 353].)

■ Involuntary manslaughter is defined as the commission of an act which involves a high degree of risk of death or great bodily injury, committed with criminal negligence; that is, conduct which is such a departure from the conduct of an ordinarily prudent person under the same circumstances as to be incompatible with a proper regard for human life. (*People* v. *Penny* (1955) 44 Cal.2d 861, 879 [285 P.2d 926]; *People* v. *Villalobos* (1962) 208 Cal.App.2d 321, 327 [25 Cal.Rptr. 111]; see CALJIC Nos. 8.45, 8.46.) Although the degree of the danger to human life may be a factor in differentiating murder from manslaughter (see *People* v. *Watson*, *supra*, 30 Cal.3d at p. 296), the essential distinction between second degree murder based on implied malice and involuntary manslaughter is the subjective versus objective criteria to evaluate the defendant's state of mind—i.e. if the defendant commits an act which endangers human life without realizing the risk involved, he is guilty of manslaughter, whereas if he realized the risk and acted in total disregard of the danger, he is guilty of murder based on implied malice. (See *People* v. *Phillips*, *supra*, 64 Cal.2d at p. 588; *People* v. *Watson*, *supra*, 30 Cal.3d at pp. 296-297; CALJIC No. 8.51.)

■ Cleaves has cited no authority which requires that implied malice be defined with the phrase "high probability" as opposed to "dangerous to human life." The phrases can be viewed as synonymous—i.e., an act for which the natural consequences are dangerous to human life by its nature involves a high probability of death. We find no error in CALJIC Nos. 8.11 and 8.31 as given by the trial court.

---

"3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life." (CALJIC Nos. 8.11, 8.31 (5th ed. 1988).)

[10] *People* v. *Dellinger*, *supra*, 49 Cal.3d at page 1217, addresses the issue whether the phrase "wanton disregard for human life" (as an alternative to the phrase "conscious disregard for human life") adequately conveyed to the jury that the defendant had to have subjectively appreciated the life-threatening risk created by his conduct.

*Failure to give involuntary manslaughter instructions*

■ Cleaves complains of the trial court's failure to give involuntary manslaughter instructions. As noted above, a defendant is guilty of murder based on implied malice if he subjectively appreciates the risk to human life arising from his conduct, whereas an involuntary manslaughter conviction is warranted if he did not subjectively realize the risk.

Cleaves admitted at trial he knew Eaton would die as a result of his tying him up and holding him down on the bed. Given Cleaves's admission of his subjective awareness of the risk, involuntary manslaughter instructions were not warranted.

*Concurrence of act and intent instructions*

■ Cleaves asserts error arising from the trial court's giving of a shortened version of CALJIC No. 3.31—i.e., telling the jury there must be concurrence between the act and specific intent—but without thereafter spelling out the specific intents for each charged crime as provided for in CALJIC No. 3.31.[11] Further, he claims error because the trial court did not additionally instruct on the need for concurrence between the act and mental state,[12] given that second degree murder based on implied malice does not require the specific intent to kill but only requires a mental state of knowledge and conscious disregard of the risk to human life. Cleaves asserts since the jury was not told there must be a concurrence between his act and his mental state for implied malice, it may have convicted him of second

---

[11] The trial court told the jury: "Before you may convict the defendant of any offense, there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless such specific intent exists, the crime to which it relates is not committed. The specific intent required is included in the definitions of the crimes."

CALJIC No. 3.31 sets forth an instruction as given by the trial court, then continues by spelling out the specific intent for each crime—i.e., "The crime of _____ requires the specific intent to _____ ." The use note to CALJIC No. 3.31 states the delineation of the specific intents need not be given if other instructions are given which include a statement of the specific intent for each crime.

[12] On appeal, Cleaves contends the trial court should have given a hybrid instruction based on CALJIC Nos. 3.31 and 3.31.5, the latter which states a certain mental state is required for each crime. His argument appears to be partially geared towards the need for CALJIC No. 3.30, which states the need for concurrence between the act and the general intent required for the crime. CALJIC No. 3.31.5 does not in its present form address the issue of concurrence, although a former version did. (Compare CALJIC No. 3.31.5 (4th ed. 1979) with CALJIC No. 3.31.5 (5th ed. 1988).)

degree murder based on implied malice without finding his act was concurrent with the requisite mental state.[13]

■ A general intent crime is one that only requires the actor intend the act which constitutes the crime. (*People* v. *Gonzalez* (1978) 81 Cal.App.3d 274, 279 [146 Cal.Rptr. 417].) A specific intent crime is one that requires the actor intend not only the proscribed act, but also that he intend some further act or additional consequence. (*People* v. *Hood* (1969) 1 Cal.3d 444, 456-457 [82 Cal.Rptr. 618, 462 P.2d 370].) A general intent crime may also involve a specific mental state, such as knowledge. (See *People* v. *Calban* (1976) 65 Cal.App.3d 578, 583-585 [135 Cal.Rptr. 441]; see generally, 17 Cal.Jur.3d, Criminal Law, §§ 87-89, pp. 129-132.)

■ First degree murder and second degree murder premised on express malice involve the specific intent to kill, whereas second degree murder premised on implied malice involves a general intent to do the act and the mental state of knowledge and conscious disregard for the risk to human life. (See *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 764-765 [175 Cal.Rptr. 738, 631 P.2d 446].)

■ ■ ■ ■ Since Cleaves was charged with both specific intent and general intent crimes, we will assume arguendo[14] the trial court had a sua sponte duty to give CALJIC No. 3.30, which refers to concurrence between act and general intent,[15] in addition to CALJIC No.

[13] Defense counsel did not object to the instruction as given by the trial court.

[14] Our Supreme Court has held that the court must on its own motion give a specific intent instruction when a specific intent crime is charged. (*People* v. *Ford* (1964) 60 Cal.2d 772, 792-793 [36 Cal.Rptr. 620, 388 P.2d 892]; accord, *People* v. *Turner* (1971) 22 Cal.App.3d 174, 184 [99 Cal.Rptr. 186].) It is not as clear whether the court must so instruct sua sponte for general intent crimes. (Compare *People* v. *Beach* (1983) 147 Cal.App.3d 612, 626-627 [195 Cal.Rptr. 381] [sua sponte requirement] with *People* v. *Gonzalez, supra,* 81 Cal.App.3d at p. 279 [only assumes arguendo, without deciding, sua sponte requirement].) The instruction is important for a specific intent crime, since the law does not presume the existence of the specific intent from the doing of the act, but rather the intent must be proven affirmatively by the People. (*People* v. *Snyder* (1940) 15 Cal.2d 706, 708 [104 P.2d 639].) In contrast, general criminal intent is presumed from the doing of the act. (*Ibid.*)

Arguably, the trial court would not be required to give the general intent concurrence instruction unless the facts raised a question as to concurrence. (See also *People* v. *Hill* (1967) 67 Cal.2d 105, 117-119 [60 Cal.Rptr. 234, 429 P.2d 586]; *People* v. *Butcher* (1959) 174 Cal.App.2d 722, 730-732 [345 P.2d 127] [since specific intent cannot be presumed from the act, when instructions are given on both general and specific intent a third instruction is necessary which states the instruction on general intent does not relate to crimes which require proof of specific intent].)

[15] CALJIC No. 3.30 states: "In the crimes charged . . . there must exist a union or joint operation of act or conduct and general criminal intent. To constitute general criminal intent it is not necessary that there should exist an intent to violate the law. When a person

3.31. (See *People* v. *Beach, supra,* 147 Cal.App.3d at p. 627; *People* v. *Gonzalez, supra,* 81 Cal.App.3d at p. 279.) Additionally, since second degree murder based on implied malice is a general intent crime but with the requirement of a certain mental state, to avoid confusion the trial court then should also have given CALJIC No. 3.31.5, or a modification thereof.[16]

However, under the facts of this case, any error was harmless. (*People* v. *Beach, supra,* 147 Cal.App.3d at p. 627; *People* v. *Gonzalez, supra,* 81 Cal.App.3d at p. 279.) Although concurrence between intent and conduct is a basic requirement for criminal culpability (see § 20),[17] it was not specifically in dispute in this case. The jury was told that second degree murder can arise from the "unlawful killing of a human being when . . . the act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life." Under this instruction, and absent facts raising a concurrence issue, the jury would not have rendered a second degree murder conviction unless it thought the requisite mental state existed jointly with Cleaves's conduct of tying up and holding Eaton down.

Moreover, there was no instructional error arising from the giving of CALJIC No 3.31 without delineating the specific intents of the charged crimes. The instructions defining the crimes set forth the necessary intents and mental states,[18] and Cleaves did not request delineation in conjunction with the concurrence instruction. (See *People* v. *Anderson* (1966) 64 Cal.2d 633, 639 [51 Cal.Rptr. 238, 414 P.2d 366].)

---

intentionally does that which the law declares to be a crime, he is acting with general criminal intent, even though he may not know that his act or conduct is unlawful."

[16] As noted in footnote 12, *ante,* the current language of CALJIC No. 3.31.5 no longer refers to concurrence, but merely states: "In each of the crimes charged . . . there must exist a certain mental state in the mind of the perpetrator. Unless such mental state exists the crime to which it relates is not committed."

Former CALJIC No. 3.31. 5, which contained the concurrence language, stated: "In each of the crimes charged . . . there must exist a union or joint operation of act or conduct and a certain mental state in the mind of the perpetrator and unless such mental state exists the crime to which it relates is not committed." The use note to former CALJIC No. 3.31.5 stated the instruction was designed for use when some particular mental state, such as knowledge, was an essential element of the offense. (CALJIC No. 3.31.5 (4th ed. 1979).) The use note does not indicate why the concurrence language was omitted from the current instruction.

[17] Section 20 states: "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence."

[18] That is, in addition to being instructed as to knowledge and conscious disregard for implied malice, the jury was given the definition of express malice based on an intention unlawfully to kill a human being, and the definitions of deliberation and premeditation for first degree murder.

## DISPOSITION

The judgment is affirmed.

Wiener, Acting P. J., and Benke, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 17, 1991.