Filed 3/20/15  P. v. Cepeda CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064835 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN304290) |
| RUBEN CEPEDA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Harry M. Elias, Judge.  Affirmed.

Christopher Nalls, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr. and Parag Agrawal, Deputy Attorneys General, for Plaintiff and Respondent.

Ruben Cepeda appeals from a judgment convicting him of two counts of second degree murder based on his act of firing a gun into his pregnant girlfriend's abdomen,

killing both his girlfriend and their unborn child.  He argues (1) there is insufficient evidence to support the second degree murder verdicts, and (2) his counsel provided ineffective representation by failing to object to the trial court's response to the jury's request for clarification on the meaning of conscious disregard for life for second degree murder.

We conclude there is sufficient evidence to support second degree murder, and defense counsel's failure to object to the court's response to the jury's clarification request was not prejudicial.

FACTUAL AND PROCEDURAL BACKGROUND

A few minutes before 7:24 p.m. on April 7, 2012, defendant (age 21) shot his girlfriend Viridiana Rodriguez (age 18) in the stomach, killing both her and their unborn son.[1]  As we shall detail below, the shooting occurred while defendant and Viridiana were in defendant's bedroom.  Witnesses present at the residence heard the gunshot, but did not otherwise observe the events in the bedroom in the moments immediately preceding the shooting.

Defendant was charged with two counts of second degree murder.  At the conclusion of trial, the prosecutor conceded that the defense had successfully refuted a claim of express-malice second degree murder based on intent to kill the victims.  However, the prosecutor argued defendant was guilty of implied-malice second degree murder because he acted in conscious disregard for life.  The primary defense claim was

---

1     We refer to Viridiana and her family members by their first names because they share the same last name.

2

that the incident was an accident, or at most, involuntary manslaughter based on criminal negligence.[2]

The shooting occurred at an apartment that defendant had just moved into with his friend Jesse Lopez. The people at the apartment at the time of the shooting were defendant, Lopez, Viridiana, and two of Viridiana's sisters (Diana and Yemely). Yemely and Diana testified about their observations at the time of the shooting, and, along with other witnesses, described relevant events in the weeks before the shooting.

Several witnesses testified that Viridiana and defendant were generally happy about her pregnancy and they did not have a history of violence between them. Two or three weeks before the shooting, defendant temporarily moved into the apartment where Viridiana was staying with her sister Diana. Diana's roommate (Jessica Aguirre) had heard defendant had several guns, and she told him she did not want any guns in the apartment. Defendant agreed to this restriction. Aguirre's cousin (Allen Guizar) testified defendant had told him he had three guns (including a nine-millimeter Glock), and he was keeping the guns at different places because he respected Aguirre's decision that he could not have guns at her apartment. However, defendant showed Guizar some gun ammunition that he had at Diana's apartment, and after the shooting the police found ammunition in the bedroom that defendant and Viridiana shared at Diana's apartment.

---

[2] As the jury here was instructed, the lesser offense of involuntary manslaughter applies only to defendant's girlfriend, not to the fetus. (*People v. Dennis* (1998) 17 Cal.4th 468, 505-506.)

One week before the shooting, defendant, Viridiana, Viridiana's sister Isabel, and several other people were at a bar late at night. Isabel testified defendant was very drunk; when they were outside getting ready to leave, defendant got into an argument with another male; and defendant pulled out a gun and shot up into the air a couple of times. Defendant's companions were frightened, and one of his friends told him to calm down. The friend took the gun away from defendant and removed the ammunition. Defendant's friends were upset and asked defendant "why did he do that."

On the day of the shooting, defendant was moving into an apartment with Lopez. That evening defendant, Lopez, Viridiana, and Viridiana's two sisters (Diana and Yemely) were at the apartment with plans to celebrate the men having their own place. Initially, the group was in Lopez's bedroom. Defendant and Viridiana were hugging and kissing in Lopez's walk-in closet, appeared to be in a good mood, and were playful with each other. Defendant and Viridiana then left Lopez's bedroom and went into defendant's bedroom. Meanwhile, Yemely and Diana were napping on Lopez's bed, and Lopez was in the bathroom connected to his bedroom and then in his walk-in closet. Everyone seemed happy and was acting normally.

After about five minutes, Yemely and Diana heard a loud noise (the gunshot). They had not heard any yelling or arguing from defendant's bedroom and nothing had seemed out of place. When they ran to defendant's bedroom, the door was open; Viridiana was on the floor; and defendant was next to her holding his shirt against her

4

abdomen.[3]  Viridiana was alive but unable to talk or move.  Defendant told Yemely and Diana to call 911; one of the sisters retrieved a cell phone from Lopez's room; and Diana called 911.

Defendant asked Yemely to hold his shirt against Viridiana's wound and to keep pressure on it and not let go.  Yemely told him she did not think she was able to do so, and he should keep holding it.  Defendant hugged Viridadana, gave her a kiss, and said, " 'I'm sorry[.]  It was an accident.' "  Yemely started holding defendant's shirt against Viridiana's abdomen, and defendant stood up.  There was a gun on the floor, and Lopez took off his shirt and wrapped the gun in the shirt without touching the gun with his hands.  Immediately thereafter, while Diana was still talking with the 911 operator and before the police arrived, defendant and Lopez left the apartment without saying where they were going.  Yemely thought they were going to ask for help.  After the police arrived, Yemely and Diana called defendant and Lopez to find out "what was going on [and] why did they leave."  Lopez answered Diana's call, but defendant did not answer his phone.

Viridiana was transported to the hospital, where she died during surgery.  An autopsy revealed she was about four months pregnant, and she had incurred a gunshot wound to her abdomen.  The characteristics of her wound and the tearing of her clothing showed that she was shot at "contact range" and that the muzzle of the gun was against her abdomen.  The authorities believed she was shot with a Glock handgun, which is

---

3     When the sisters arrived at defendant's bedroom, Viridiana was either already lying on the floor, or she was standing and then lowered to the floor by defendant.

designed with safety features so the gun can be fired only if the trigger is pulled and which requires 5.5 pounds of pressure to pull the trigger.

At about 8:30 p.m. on the night of the shooting, border patrol agents saw a man cross the highway and then climb over a fence in the area of the Mexican border crossing. When they asked motorists in line to go to Mexico if they had seen the man get out of one of the cars, they were directed to a truck being driven by Lopez. Lopez denied that the man had been in his vehicle. After a brief detention and search of Lopez and his vehicle, the agents released Lopez because at the time they were unaware of the shooting. Cell phone records showed repeated phone calls from defendant's phone to Lopez's phone from locations in the border area between 8:29 p.m. and 11:40 p.m. on the night of the shooting. On June 11, 2012, defendant was apprehended in Tijuana and transported to the United States. The gun used in the shooting was never found.

*Jury Verdict and Sentence*

Defendant was charged with the second degree murder of Viridiana and their unborn child (counts 1 and 2). Each count included several firearm allegations, including intentional and personal discharge of a firearm causing death (Pen. Code, § 12022.53, subd. (d)), and personal use of a firearm (Pen. Code, § 12022.53, subd. (b)).

The jury was instructed on second degree murder and the lesser offense of involuntary manslaughter. The jury found defendant guilty of the two counts of second degree murder, and found true the allegations that he personally used a firearm. The jury found not true the allegations that he intentionally and personally discharged a firearm. For count 1, the court imposed a sentence of 30 years to life (a 15-year-to-life term

6

doubled based on a prior strike conviction), plus a determinate term of 10 years for the gun use enhancement. For count 2, the court imposed the same sentence to run concurrently.

DISCUSSION

Defendant argues (1) the evidence does not support that he acted in conscious disregard for life because there was no showing that he was subjectively aware of the risk to life, and (2) his counsel provided ineffective assistance by failing to object when the trial court responded to the jury's request for clarification of the meaning of "conscious disregard for life" by referring the jury back to the standard instructions.

To assist with our evaluation of defendant's contentions, we first summarize relevant homicide law principles.

I. *Homicide Principles*

Second degree murder is an unlawful killing committed with malice, but without the elements of premeditation and deliberation required for first degree murder. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.) Malice may be express (intent to kill) or implied (commission of life-threatening act with conscious disregard for life). (*Ibid*.) Involuntary manslaughter is an unlawful killing committed with criminal negligence (gross or reckless conduct that creates high risk to life), but without the intent to kill or conscious disregard for life associated with murder. (*People v. Butler* (2010) 187 Cal.App.4th 998, 1006-1008; *People v. Cleaves* (1991) 229 Cal.App.3d 367, 378.)

Second degree implied-malice murder has both a physical component and a mental component. (*People v. Chun, supra*, 45 Cal.4th at p. 1181.) The physical

7

component is evaluated objectively, and it requires the performance of an act, the natural consequences of which are dangerous to life (i.e., create a high degree of probability of death). (*Ibid.*; *People v. Knoller* (2007) 41 Cal.4th 139, 153, 157.) The mental component is evaluated subjectively, requiring that the defendant knows his conduct endangers life and that he acts with a conscious disregard for life. (*Chun, supra*, at p. 1181; *Knoller, supra*, at pp. 153, 157.)

When differentiating between implied-malice murder and involuntary manslaughter, the degree of danger to human life created by the defendant's act is a relevant factor to consider. (See *People v. Watson* (1981) 30 Cal.3d 290, 296; *People v. Cleaves, supra*, 229 Cal.App.3d at p. 378.) Further, unlike second degree murder, the mental component for involuntary manslaughter is evaluated objectively. That is, implied malice requires that the defendant subjectively appreciate the risk involved, whereas criminal negligence merely requires that a reasonable person would have been aware of the risk. (*Watson, supra*, at pp. 296-297; *Cleaves, supra*, at p. 378.)

As explained in *Watson*: "*[G]ross negligence . . .* has been defined as the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences. [Citation.] On the other hand, *malice* may be implied when a person, knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life. [Citations.] Though these definitions bear a general similarity, they are not identical. *Implied malice contemplates a subjective awareness of a higher degree of risk than does gross negligence, and involves an element of wantonness which is absent in gross negligence*. [Citations.] [¶] Furthermore, we have

8

applied different tests in determining the required mental states of gross negligence or malice.  A finding of gross negligence is made by applying an *objective* test:  if a *reasonable person* in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness.  [Citation.]  However, a finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard."  (*People v. Watson, supra*, 30 Cal.3d at pp. 296-297, some italics added.)  In short, "if the defendant commit[ted] an act which endangers human life without realizing the risk involved, he is guilty of [involuntary] manslaughter, whereas if he realized the risk and acted in total disregard of the danger, he is guilty of murder based on implied malice."  (*People v. Cleaves, supra*, 229 Cal.App.3d at p. 378.)

Thus, the conscious disregard element " 'requires the jury to question [the defendant's] subjective thoughts while committing the crime.' "  (*People v. Benson* (1989) 210 Cal.App.3d 1223, 1229.)  The defendant must have a "knowing or conscious appreciation of the risk to human life" created by his or her conduct and must disregard that risk.  (*Ibid.*; *People v. Cleaves, supra*, 229 Cal.App.3d at p. 378.)  However, ill will towards the victim is not required, and conscious disregard may exist even if the death was accidental in the sense the defendant did not intend to kill anyone.  (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 103, 110 ["Even if the act results in a death that is accidental, as defendant contends was the case here, the circumstances surrounding the act may evince implied malice."]; *People v. Swain* (1996) 12 Cal.4th 593, 603 [intent to cause death not required].)

9

When evaluating implied malice, it is appropriate to consider "the circumstances preceding the fatal act." (*People v. Nieto Benitez, supra*, 4 Cal.4th at p. 107.) For example, conscious disregard for life can readily be inferred when the circumstances show the defendant's conduct just before the fatal act was so highly dangerous to human life that virtually no one would be unaware of the risk. (See *People v. Thomas* (2012) 53 Cal.4th 771, 814-815; *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1263; *People v. Moore* (2010) 187 Cal.App.4th 937, 941.) For example, in *Thomas*, the court found no reversible error from the failure to instruct on involuntary manslaughter, reasoning: "[The] defendant put the gun to [the victim's] head and threatened to kill him. Such conduct is highly dangerous and exhibits a conscious disregard for life." (*Thomas, supra*, at pp. 814-815; *Boatman, supra*, at p. 1263 [substantial evidence of implied malice based on defendant's act, even in jest, of pointing gun at girlfriend and cocking hammer back, knowing gun was loaded].) Similarly, in *Moore*, the court delineated the highly dangerous driving maneuvers by the defendant [drove 70 miles per hour in 35-mile-per-hour zone, crossed into opposing traffic, ran red light, and struck car without attempting to apply brakes] and concluded substantial evidence supported implied malice, stating: "His actions went well beyond gross negligence. . . . [¶] Whether [he] was subjectively aware of the risk is best answered by the question: how could he not be? It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, [he] was aware of the risk." (*Moore, supra*, 187 Cal.App.4th at p. 941.)

10

## II. *Sufficiency of the Evidence To Support Conscious Disregard for Life*

In reviewing a challenge to the sufficiency of the evidence, we examine the entire record in the light most favorable to the judgment to determine whether there is substantial evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Nelson* (2011) 51 Cal.4th 198, 210.) We presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*Ibid.*) A defendant's state of mind is inherently difficult to prove by direct evidence; accordingly, state of mind may properly be inferred from " 'the act itself, together with its surrounding circumstances . . . .' " (*People v. Edwards* (1992) 8 Cal.App.4th 1092, 1099.) If the circumstances reasonably justify the jury's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*Nelson, supra*, 51 Cal.4th at p. 210.)

To support his claim the evidence cannot support a finding he acted in conscious disregard for life, defendant cites the prosecutor's concession that he did not intend to kill his girlfriend and unborn child, and the jury's not true finding on the intentional gun discharge allegation. Defendant reasons the evidence shows he intentionally placed the gun against Viridiana's abdomen and pulled the trigger, and because he did not want to hurt her or want the gun to discharge, he must have thought the gun was unloaded. Further, he posits he could not have subjectively appreciated the risk the gun was loaded because if he had, he would not have pulled the trigger. The jury was not required to reach these conclusions.

The forensic evidence showed that Viridiana and her fetus were killed by a gun that was discharged while the muzzle was placed against her abdomen. As defendant concedes on appeal, the evidence supports he was the person who placed the gun against her abdomen. This fact alone—the act of placing the barrel of a gun against a person's abdomen—creates an inference of conscious disregard for life. The jury could reasonably find that placing a firearm against a person's abdomen (an area of the body containing vital organs) is so highly dangerous that (absent extreme youth or mental deficiency) everyone—including defendant—who engages in this conduct would know it creates an extreme risk of death and has chosen to disregard that risk. Given the very nature of firearms, the mere fact that defendant did not *want* the gun to fire and that he *thought* it would not fire does not preclude a jury finding that he was aware of the risk that it *might* fire.

Further, there was nothing in the record to rebut the inference of conscious disregard arising from the nature of defendant's act. Although defendant maintains on appeal that he must have thought the gun was unloaded or he would not have placed the gun against Viridiana's abdomen and pulled the trigger, there was no evidence that he had taken affirmative measures to ensure the gun could not discharge a bullet under any circumstances. Absent evidence defendant had a basis to conclude the gun could not discharge (i.e., he made a complete inspection to confirm it was not loaded), the jury could reasonably infer that he must have known that even the slightest possibility that he was mistaken would lead to the propulsion of a bullet into Viridiana's abdomen, notwithstanding any lack of intention on his part to achieve this result. This case readily

12

falls into the category of circumstances showing that the defendant's act "went well beyond gross negligence" and where it would "take no leap of logic for the jury to conclude that because anyone would be aware of the risk, [he] was aware of the risk." (*People v. Moore, supra*, 187 Cal.App.4th at p. 941.)

To support his challenge to the sufficiency of the evidence, defendant also cites the conscious disregard standard set forth in *People v. Olivas* (1985) 172 Cal.App.3d 984. In *Olivas*, the court sought to distinguish in "everyday language" between the mental state for implied malice and involuntary manslaughter, stating, conscious disregard for the offense of murder means, " 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed' "; conscious indifference for the offense of involuntary manslaughter means " 'I don't care what happens' "; and "[i]t makes sense to hold the former more culpable than the latter, since only the former is actually aware of the risk created."  (*Id*. at p. 988.)  Relying on *Olivas*, defendant argues there was no evidence that his state of mind was, " 'I know my conduct is dangerous to [Viridiana] and my child, but I don't care if they are hurt or killed.' "  We do not construe the *Olivas* formulation as foreclosing an implied malice finding whenever the defendant emotionally cares about the victim not getting hurt or killed.  The fact that defendant did not want to hurt or kill his girlfriend and unborn child does not defeat the support for the jury's finding that he knew his conduct created a high risk to life and he consciously disregarded that risk when he placed the muzzle of a gun against his girlfriend's abdomen.  (See, e.g., *People v. Boatman, supra*, 221 Cal.App.4th at p. 1263.)

13

There is substantial evidence to support a finding that the nature of defendant's conduct showed conscious disregard for life.

III. *Ineffective Assistance of Counsel Concerning Response to Jury's Question About Conscious Disregard for Life*

During deliberations, the jury sent the court a note asking: "For the implied malice 'test,' are we to judge 'a conscious disregard . . . ' from a 'reasonable person' measure using 'common sense'? As opposed to this specific person, Ruben Cepeda?" When discussing the question outside the presence of the jury, the court stated the question was answered in the standard jury instruction on second degree murder (CALCRIM No. 520). In response, defense counsel, with the prosecutor's concurrence, suggested the court simply refer the jury back to the instructions.[4] Accordingly, the court answered the jury's question by sending a note stating: "CALCRIM 520 defines implied malice and lists the 4 elements thereof. There is no further legal description."

The CALCRIM No. 520 second degree murder instruction provided to the jury defined implied malice, stating: "The defendant acted with *implied malice* if: [¶] 1. He intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human or fetal life."

---

4    The court commented, "[CALCRIM No. 520] says he acted, he acted. So they got to decide whether conscious disregard. There's nothing specifically in the law that says whether that is subjective or objective standard."

14

The jury was also instructed with CALCRIM No. 580, which refers to the mental state for murder in the context of explaining the distinctive mental state for involuntary manslaughter, stating: "The difference between other homicide offenses and involuntary manslaughter depends on *whether the person was aware of the risk to life that his actions created and consciously disregarded that risk*. An unlawful killing caused by a willful act done with *full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is . . . murder*. An unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter. [¶] . . . [¶] . . . A person acts with criminal negligence [for involuntary manslaughter] when: [¶] 1. He acts in a reckless way that creates a high risk of death or great bodily injury; [¶] AND [¶] 2. *A reasonable person would have known that acting that way would create such a risk*." (Italics added.)

These standard jury instructions informed the jury that implied-malice second degree murder requires the defendant's knowledge and awareness of the danger to life and conscious disregard of that risk; the absence of this knowledge and conscious disregard can reduce the offense to involuntary manslaughter which merely requires criminal negligence; and criminal negligence is governed by a reasonable person standard. Considered together, the instructions told the jury to use a subjective standard for conscious disregard for life; i.e., implied malice requires the defendant's knowledge and awareness and conscious disregard of the risk, whereas criminal negligence is judged by a reasonable person standard.

15

Defendant asserts the jury might have been confused about what standard to apply because at one point in closing arguments the prosecutor urged the jury to evaluate defendant's conduct from the perspective of a reasonable person.  Although the prosecutor discussed whether a reasonable person would place a gun against a pregnant woman's abdomen, this statement was made in the context of the prosecutor's assertions that everyone knows guns are dangerous and should not be pointed at people.  During the course of his closing arguments, the prosecutor repeatedly referred to defendant's subjective awareness, arguing that defendant (like everyone else) knows guns are deadly weapons.[5]  Considering the prosecutor's arguments as a whole, the prosecutor was not telling the jury to disregard defendant's subjective state of mind when evaluating the second degree murder charge, but rather was urging the jury to infer that because everyone knows guns are dangerous and defendant had experience with guns, defendant must have realized the risk to life when he caused the gun to be placed against his girlfriend's abdomen.

Although the instructions correctly informed the jury of the relevant mental states, because the second degree murder instruction standing on its own does not explicitly spell out the distinction between a subjective and objective standard, and because the

---

5    For example, the prosecutor stated, "Everyone knows that guns are deadly weapons.  [¶] *The defendant Ruben Cepeda is no different*."  "I told you the number of acts that Ruben Cepeda did, including taking out a loaded firearm—it's obviously dangerous to human life.  *Does anyone have a doubt as to whether the defendant knows that*?  That's why we began with this discussion with guns are dangerous.  *He knows it's dangerous*, and he did it anyways.  When we say he did it anyways, . . . he consciously disregarded human life."  "He doesn't need to know that his actions are a violation of the law.  *He just needs to know that he's consciously disregarding human life*."

16

jury's note requested guidance on the standard, it would have been preferable for the trial court to have informed the jury that conscious disregard required them to evaluate defendant's state of mind, not a reasonable person's state of mind. Although a trial court need not always elaborate on the standard instructions in response to a jury request for clarification, the court should do so when there may be some uncertainty and the jury has expressed confusion. (See *People v. Beardslee* (1991) 53 Cal.3d 68, 97; *People v. Loza* (2012) 207 Cal.App.4th 332, 355; *People v. Giardino* (2000) 82 Cal.App.4th 454, 466.)

As defendant recognizes, defense counsel's failure to object to the court's response forfeits the issue on appeal (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1352), but we may review the claim of error based on his assertion of ineffective assistance of counsel (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1007). To show ineffective representation, the defendant must establish that counsel's performance fell below an objective standard of reasonableness, and there is a reasonable probability that absent counsel's deficiency the result would have been different. (*Ibid.*) If the record does not show prejudice from counsel's alleged deficiency, we may reject the claim without determining whether counsel's performance was deficient. (*Id.* at p. 1008.)

Assuming reasonably competent counsel would have requested clarification of the standard instructions in response to the jury's note, there is no reasonable probability the error affected the outcome. First, this is not a case where the jury was given incorrect instructions on the required subjective mental state for conscious disregard; thus, there is no concern that the jury was affirmatively misled when the trial court referred them back to the standard instructions. Second, in closing arguments, the prosecutor repeatedly

17

stated that *defendant* (like everyone else) knew his conduct was dangerous to life, thereby reinforcing that murder requires an evaluation of defendant's subjective state of mind. (See fn. 5, *ante*.) Finally, the circumstances of this case present a strong inference that defendant subjectively understood and disregarded the risk to life. It is common knowledge that placing a gun against a person's abdomen is highly dangerous to life because the remotest possibility of discharge can have fatal consequences. Because there was no showing that defendant had taken measures to be certain the gun could not discharge, there was nothing to dispel the compelling inference that he knew about and disregarded the extreme risk to life created by this conduct. Further, the mere fact that defendant thought the gun could not or would not discharge, but without evidence that he had affirmatively confirmed this belief, provided but a weak inference to rebut the strong showing that defendant engaged in conduct that by its nature far exceeded gross negligence and fell into the realm of conscious disregard for life.

Considering all these factors, there is no reasonable probability the failure to provide the jury with a clarifying instruction on conscious disregard affected the outcome of the case.

18

DISPOSITION

The judgment is affirmed.


HALLER, J.


WE CONCUR:


McCONNELL, P. J.


McINTYRE, J.