Filed 2/26/15  P. v. Lonnberg CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>STACY CHRISTINE LONNBERG,<br><br>    Defendant and Appellant. | H040374<br>(Santa Clara County<br>Super. Ct. No. C1224372) |

## STATEMENT OF THE CASE

A jury convicted defendant Stacy Christine Lonnberg of two counts of second degree murder (Pen. Code, §§ 187/189) and one count of child endangerment (Pen. Code, § 273a, subd. (a)).  The trial court sentenced her to a prison term of 30 years to life concurrent to two years.

Defendant now appeals from the judgment of conviction.  She makes the following arguments on appeal:  1) the trial court erred in refusing to give a pinpoint instruction regarding implied malice; 2) the trial court erred in refusing to admit the testimony of a defense expert; 3) trial counsel rendered ineffective assistance in failing to object to an item of testimony and in eliciting an item of evidence; 4) the trial court erred in admitting a photograph of one victim's body; and 5) the prosecutor committed misconduct in cross-examining a defense expert.

As set forth below, we find no merit in defendant's claims. We therefore will affirm the judgment of conviction.

STATEMENT OF THE FACTS

*The Traffic Accident*

At approximately 3:45 p.m. on January 14, 2012, defendant was driving her pickup truck on Highway 85. There were three passengers in defendant's truck: her infant grandson, Ethan Nicolai; her husband, Fred Lonnberg; and her daughter, Tiffany Gillette.[1] A witness testified that defendant was driving in excess of 85 miles per hour when her truck struck another vehicle. Defendant's truck appeared to be "out of control," and it rolled over six to eight times. While defendant's truck was rolling, Tiffany was ejected from the truck, and Fred was partially ejected from the truck. Tiffany suffered a complex skull fracture and multiple blunt force injuries, and she died at the scene. Fred also suffered a complex skull fracture, and he died later that night. Ethan, who was sitting in a booster seat that was inappropriate for his height and weight, was not physically harmed.

An officer who responded to the scene saw defendant sitting in the driver's seat of the truck. She smelled of alcohol, her speech was slow and slurred, and her eyes were glassy and droopy. She failed a field sobriety test. She told the officer that she had not eaten anything that day, and that she had slept only five hours the night before. She also stated that she had ingested Oxycodone.

Defendant's blood was drawn at 6:05 p.m., and testing established a blood alcohol content of .16 percent. A criminalist explained that, given the passage of time, defendant's blood alcohol content would have been .20 percent at the time of the

---

[1] Defendant has the same surname as Fred Lonnberg. We will refer to defendant's family members by their first names in order to avoid any confusion.

2

accident. Testing also established the presence of Oxycodone in defendant's blood. The criminalist explained that Oxycodone is the active ingredient in Oxycontin. The criminalist further explained that blood is not tested "specifically for Oxycontin," and it was thus impossible to determine whether defendant had ingested an Oxycodone pill or an Oxycontin pill.

An officer searched defendant's truck after the accident, and he found a water bottle that was half full of vodka. Testing showed that defendant's DNA was on the lip of the water bottle.

### Prior Warnings Regarding Alcohol Consumption

Dr. William Seals, a veterinarian and defendant's employer from September 2006 to August 2008, fired defendant for being intoxicated at work. He told her that it was dangerous for her to be intoxicated at work. He informed her that she could have her job back if she provided proof that she had completed a treatment program. Defendant never provided such proof.

Kelly Scilingo, a friend of Fred, testified that she had warned defendant about the dangers of drinking and driving. Scilingo specifically warned defendant that she would kill someone if she continued drinking.

It was stipulated that defendant was convicted of alcohol-related reckless driving (Veh. Code, § 23103) in June 2005. Because of the conviction, defendant was required to attend a 12-hour program regarding the dangers of drinking and driving, which she completed in August 2005. As part of the conviction, she signed a written admonition that stated the following: "being under the influence of alcohol or drugs or both impairs your ability to safely operate a vehicle," it is "extremely dangerous to human life to drive while under the influence of alcohol or drugs or both," and "you could be charged with murder" if "you continue to drive under the influence of alcohol or drugs or both and as a result of that driving someone is killed."

3

*Defense Evidence*

Defendant testified on her own behalf. She admitted that she was drunk when she was involved in the accident that killed Fred and Tiffany. She testified, however, that she did not think drunk driving posed a danger to human life. She explained that she was an alcoholic, and that she had safely driven under the influence on "thousands" of occasions. She also explained that she had witnessed her intoxicated mother drive safely "thousands of times."

In 2011, defendant obtained an Oxycontin prescription in order to treat a back injury. The medication came in the form of a brown pill, and she referred to the pills as "Oxy." Defendant testified that she had safely driven while under the influence of alcohol and "Oxy." She never experienced drowsiness when she consumed alcohol with "Oxy."

Defendant testified that she experienced back pain on the day of the accident, and that Tiffany gave her a blue pill "just before" the family got into defendant's truck. Tiffany told defendant that the blue pill was an "Oxy." Defendant swallowed the blue pill, which she thought contained the same medicine as the brown pills she had previously used. Defendant testified that she suddenly became very drowsy while she was driving, and that the accident occurred while she was attempting to get off of the highway.

Defendant's doctor, Moshe Lewis, testified that he prescribed Oxycontin to defendant in 2011. When Dr. Lewis issued the prescription, he advised defendant to not drink alcohol while taking Oxycontin, and he also advised her that it could be dangerous to drive while using Oxycontin.

A doctor testified that he prescribed Oxycodone to Tiffany in November of 2011. A pharmacist testified that Tiffany obtained blue or white Oxycodone pills.

4

Dr. Bruce Victor provided expert testimony regarding the difference between Oxycodone pills and Oxycontin pills. He explained that Oxycodone pills have their "peak effect inside of an hour" and can make a person "instantly sleepy." He explained that Oxycontin pills "have a much slower release."

## DISCUSSION

### I. *Pinpoint Instruction*

Defendant contends that the trial court erred in refusing to give a pinpoint instruction regarding implied malice. Specifically, defendant contends that the trial court erred in refusing to instruct the jury that "an act is dangerous to human life when there is a high probability it will result in death." As explained below, the trial court did not err in refusing to give the pinpoint instruction.

#### A. *Background*

The trial court instructed the jury pursuant to CALCRIM No. 520. As given, the instruction stated in pertinent part:

"The defendant is charged in Counts 1 and 2 with murder in violation of Penal Code section 187.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant committed an act that caused the death of another person;

"AND

"2. When the defendant acted, she had a state of mind called malice aforethought.

"There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder.

"The defendant acted with express malice if she unlawfully intended to kill.

"The defendant acted with implied malice if:

5

"1.  She intentionally committed an act;

"2.  The natural and probable consequences of the act were dangerous to human life;

"3.  At the time she acted, she knew her act was dangerous to human life;

"AND

"4.  She deliberately acted with conscious disregard for human life."

Defendant requested that the trial court give the following pinpoint instruction: "For the purpose of defining the second element of implied malice, an act is dangerous to human life when there is a high probability it will result in death.  Such an act is required before implied malice may be found."

The trial court refused to give defendant's requested pinpoint instruction.  It explained:  "The court understands that the terms have been used synonymously by the courts and deemed synonymous.  However[,] the court finds the CALCRIM instruction is adequate to give to a jury[,] and the instruction as presented by [the] defense would be duplicative.  [¶] And for those reasons, the court finds that the fact that it's duplicative would only confuse the jury and just confuse . . . their analysis and deliberation."

## B.  *The Trial Court Did Not Err*

A defendant "has a right to an instruction that pinpoints the theory of the defense." (*People v. Mincey* (1992) 2 Cal.4th 408, 437, italics omitted.)  The trial court may, however, "properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation] or if it is not supported by substantial evidence [citation]."  (*People v. Moon* (2005) 37 Cal.4th 1, 30.) We apply the de novo standard of review when determining whether the trial court erred in refusing to give a requested pinpoint instruction.  (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707.)

6

Our Supreme Court has explained the concept of implied malice as follows: "We have said that second degree murder based on implied malice has been committed when a person does ' " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' " . . . .' [Citations.] Phrased in a different way, malice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life. [Citation.]" (*People v. Watson* (1981) 30 Cal.3d 290, 300.)

"Supreme Court precedent does not establish that the term 'high probability of death,' as opposed to the phrase 'dangerous to human life,' has been utilized as the pivotal terminology to define implied malice. Rather, the two phrases have been used as alternative definitions for the same concept." (*People v. Cleaves* (1991) 229 Cal.App.3d 367, 378 (*Cleaves*).) "The phrases can be viewed as synonymous—i.e., an act for which the natural consequences are dangerous to human life by its nature involves a high probability of death." (*Ibid.*) The phrases " 'an act, the natural consequences of which are dangerous to life' and 'an act [committed] with a high probability that it will result in death' are equivalent and are intended to embody the same standard." (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 111, brackets in original (*Nieto Benitez*).)

Here, the trial court did not err in refusing to give defendant's pinpoint instruction. The authority described above establishes that defendant's pinpoint instruction was unnecessary. Indeed, when one looks at the language of CALCRIM No.520, it is apparent that defendant's pinpoint instruction was duplicative. CALCRIM No. 520 informed defendant's jury that it could find implied malice only if the "natural and probable" consequences of defendant's conduct were dangerous to human life. We believe that such language informed the jury that it could find implied malice only if

7

defendant's conduct involved a high probability of death. Thus, defendant's pinpoint instruction was duplicative, and the trial court did not err in refusing to give it. (See generally *Nieto Benitez, supra,* 4 Cal.4th at pp. 110-111 [pattern instruction that required an act with natural consequences dangerous to human life was a correct statement of law, and trial court was not required to sua sponte instruct that the act must involve a high probability of death]; *Cleaves, supra,* 229 Cal.App.3d at p. 378 [concluding that no authority requires implied malice to be defined with the phrase "high probability" of death as opposed to "dangerous to human life"].)

## II. *Exclusion of Expert Testimony*

Defendant contends that the trial court erred in excluding the expert testimony of Dr. Alan C. Donelson. As explained below, we conclude that the trial court did not abuse its discretion in excluding the testimony.

### A. Background

Before trial, defendant moved for the admission of the expert testimony of Dr. Alan C. Donelson. In the written motion defendant contended: "Dr. Alan C. Donelson is an expert in pharmacology, toxicology, and applied statistics. Dr. Donelson is prepared to present statistical evidence regarding the improbability of any particular drunk driving incident resulting in a fatality. According to Dr. Donelson, there were more than 112 million 'self-reported' drunk driving incidents in 2010. The National Highway Traffic Safety Administration estimated that there were some 9,813 fatal drunk driving crashes in 2009. Using these figures, Donelson calculates that only about 1 in every 11,400 instances of drunk driving results in a fatal crash. [¶] His testimony would be that when [defendant] drove the truck in her state of inebriation there was a low probability of killing anyone. If the jury hears and believes the testimony of Alan Donelson that would negate an element of implied malice and keep the jury from convicting [defendant] of murder."

8

In support of the motion, defendant filed a report authored by Dr. Donelson. The report contained statistics regarding the probability of a fatal vehicle crash. The report also contained statistics regarding alcohol-impaired driving. The report did not include any statistics regarding driving under the influence of drugs. The report concluded: "A driver with an elevated [blood alcohol concentration] who has also taken a therapeutic dose of oxycodone may have a risk of fatal crash involvement even higher than a driver consuming only beverage alcohol. Nonetheless, given the extremely low average risk of causing a fatal crash, the increased likelihood of a fatal crash for drivers who drink excessively or who combine alcohol and Oxycodone still does not equate to a 'high probability,' nor is the resultant likelihood accurately characterized as 'very likely' or even 'more likely than not.' "

The prosecutor opposed defendant's motion. The prosecutor argued in part: "[T]he information that the defense expert will be relying on has no relevance to the defendant's actions in this specific case. There are no statistics available to show that driving with a blood alcohol level of .16 while under the influence of Oxycodone coupled with speeding is not dangerous behavior. There is simply no data that reflects this specific fact pattern."

At oral argument on the motion, the trial court asked defense counsel whether Dr. Donelson had statistics regarding "the 1-6 and Oxycodone." Defense counsel responded that Dr. Donelson formed his opinion based on studies involving alcohol-impaired driving. Defense counsel then argued: "I believe Dr. Victor will testify . . . Oxycodone has the effect of enhancing or amplifying the effects of alcohol. [¶] What Dr. Donelson will testify to [is] if you took .16 and include the Oxycodone, amplified it a hundred percent, such that the blood alcohol level was .32[,] the probability that [defendant] would cause a fatal car accident would be statistically very low. [¶] Oxycodone has the effect of enhancing the effects of alcohol. If you took .16 and

9

doubled it and enhanced it, the numbers would still come out the same; very, very low." The trial court then asked, "So is [Dr. Donelson] basing his opinion on someone who is .32, of all the studies done of people in that range of .32?" Defense counsel responded, "There is no way of knowing exactly how . . . the Oxycodone . . . affected [defendant] on that day at that time."

The trial court denied defendant's motion. It explained: "In looking at the evidence I find that [Dr.] Donelson would have some relevant evidence. I can't say there is absolutely no relevance to [his] testimony, however it's so speculative and prejudicial and so confusing that I felt under [Evidence Code section] 352 it clearly should not be admissible in this case." The trial court noted that defendant "allegedly used both alcohol and Oxycodone" on the day of the accident, that Dr. Donelson's findings were "based on statistics regarding DUI's," and that Dr. Donelson had "no real statistics" pertaining to individuals who consume drugs in combination with alcohol. The trial court also noted that Dr. Donelson's findings failed to account for other variables present in defendant's case, including her lack of sleep, her minimal food consumption, and the high rate of speed at which she drove. The trial court ultimately concluded that Dr. Donelson's testimony would be "extremely speculative" and "time consuming," that the probative value of his testimony was "almost nil," and that the probative value of his testimony was "far outweighed by the prejudicial effect on the jury of hearing statistics that don't seem to conform with the facts of this case."

## B. *The Trial Court Did Not Abuse its Discretion*

Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "Speculative inferences are, of course, irrelevant." (*People v. Stitely* (2005) 35 Cal.4th 514, 549-550.)

10

"The trial court is vested with wide discretion in determining the relevance of evidence." (*People v. Babbitt* (1998) 45 Cal.3d 660, 681.)

Evidence Code section 352 "accords the trial court broad discretion to exclude even relevant evidence." (*People v. Clark* (2011) 52 Cal.4th 856, 893.) Pursuant to Evidence Code section 352, the trial court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time or . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

"We review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion." (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.) We find no abuse of discretion here.

Defendant sought to admit Dr. Donelson's testimony in order to show that her conduct was not dangerous to human life and to thus negate an element of implied malice murder. The trial court properly concluded that Dr. Donelson's testimony had very little relevance in that regard. Defendant drove while she was under the influence of alcohol *and* Oxycodone. All of the statistics provided by Dr. Donelson pertained to alcohol-impaired driving. Dr. Donelson provided no statics regarding drivers who consume alcohol in combination with drugs, and his report failed to identify any effects of drug use upon drivers. Thus, his conclusion that defendant's conduct presented a "low probability of killing anyone" appears to have been speculative. Indeed, defense counsel conceded that there was "no way of knowing" how the combined use of alcohol and Oxycodone affected defendant's driving. It is therefore apparent that Dr. Donelson's testimony had very little, if any, relevance. In light of the minimal probative value of Dr. Donelson's testimony, the trial court did not err in excluding the testimony pursuant to Evidence Code section 352. As noted by the trial court, Dr. Donelson's testimony would have been time consuming, and it had the potential to confuse the issues because it involved

11

numerous statistics that did not conform with the facts of defendant's case. Accordingly, for the foregoing reasons, we must conclude that the trial court did not abuse its discretion in excluding Dr. Donelson's testimony.

## III. *Ineffective Assistance of Counsel*

Defendant contends that defense counsel rendered ineffective assistance in failing to object to Dr. William Seals's testimony regarding medication that was missing from his veterinary hospital. Defendant further contends that defense counsel rendered ineffective assistance in eliciting evidence that she had hit prosecution witness Kelly Scilingo. As explained below, defendant has failed to establish ineffective assistance of counsel.

### A. *Background*

On direct examination, Dr. Seals testified regarding an occasion when defendant "came into the hospital and picked up a couple of tubes of medication," explaining that hospital employees "found [defendant] in the hospital taking the medication." Defense counsel objected to the testimony on the ground of hearsay, and the trial court sustained the objection and struck the testimony. The trial court then asked Dr. Seals, "Did you find any medication missing . . . or notice anything missing?" Dr. Seals responded, "We had a period of time where we were missing medication, yes." Dr. Seals explained that the missing medication was an animal de-wormer, not a medication that a human would take. Defense counsel made no objection beyond his initial hearsay objection.

On cross-examination of Scilingo, defense counsel elicited testimony suggesting that Scilingo could be biased against defendant. Defense counsel asked Scilingo if she and defendant had ever argued, and Scilingo responded, "Yes." Defense counsel then asked Scilingo whether defendant had ever hit her. Scilingo confirmed that defendant had hit her on two occasions, and she briefly described those two incidents. Defense counsel asked Scilingo whether those two incidents caused Scilingo to "really dislike"

12

defendant or caused Scilingo to develop "an extreme dislike" for defendant. Scilingo admitted that she was "offended" when appellant hit her.

**B.** *Defendant Has Failed to Establish Ineffective Assistance of Counsel*

The defendant bears the burden of proving ineffective assistance of counsel. (*People v. Carter* (2003) 30 Cal.4th 1166, 1211 (*Carter*).) To obtain reversal due to ineffective assistance, a defendant must first show "that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003 (*Cunningham*); *Strickland v. Washington* (1984) 466 U.S. 668, 688.) Second, the defendant must show that there is "a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings." (*Cunningham, supra,* 25 Cal.4th at p. 1003.)

"A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (*Carter, supra,* 30 Cal.4th 1166, 1211; see also *People v. Witcraft* (2011) 201 Cal.App.4th 659, 664.) Where the record on appeal "does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) "In order to prevail on such a claim on direct appeal, the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission." (*People v. Ray* (1996) 13 Cal.4th 313, 349.)

We cannot conclude that defense counsel rendered ineffective assistance in eliciting testimony that defendant had hit Scilingo. The record reveals a rational tactical purpose for defense counsel's conduct. On direct examination, Scilingo testified that she had warned defendant of the dangers of drinking and driving. That testimony undercut

13

the defense theory that defendant was unaware of the dangers of drunk driving. Thus, in an apparent effort to discredit Scilingo's testimony, defense counsel elicited testimony suggesting that Scilingo was biased against defendant. Defense counsel specifically asked Scilingo whether the hitting incidents caused her to "really dislike" defendant or caused her to develop "an extreme dislike" for defendant. Given that the hitting incidents provided a strong motive for Scilingo to be biased against defendant, defense counsel's decision to inquire about the hitting incidents was reasonable. Defendant therefore has failed to show that defense counsel rendered ineffective assistance in eliciting testimony that defendant had hit Scilingo. (See generally *People v. Cleveland* (2004) 32 Cal.4th 704, 746 ["normally the decision to what extent and how to cross-examine witnesses comes within the wide range of tactical decisions competent counsel must make," and a reviewing court is reluctant to second-guess such a decision].)

Likewise, defense counsel's failure to object to Dr. Seals's testimony regarding the missing animal de-wormer did not constitute ineffective assistance of counsel. The testimony was elicited immediately after the trial court had sustained a defense hearsay objection and in response to the trial court's question regarding Dr. Seals's own observations. Given that the testimony regarding the missing animal de-wormer was based on Dr. Seals's personal observations, defense counsel would have properly concluded that a further hearsay objection was meritless. Although defendant asserts that defense counsel should have made a relevance objection, defense counsel could have reasonably concluded that such an objection would have been futile given that the testimony was elicited in response to a question posed by the trial court. The "failure to object is a matter of trial tactics that an appellate court will seldom second-guess." (*Carter, supra,* 30 Cal.4th at p. 1209.) Moreover, even if we were to conclude that defense counsel's failure to object was unreasonable, defendant cannot establish the requisite prejudice. Dr. Seals's testimony regarding the missing animal de-wormer was

14

very brief, and it is unlikely that the jury ascribed much weight to the disappearance of medication that was not fit for human consumption. Defendant therefore has failed to show a reasonable probability of a more favorable result if defense counsel had objected to the testimony, and we cannot find ineffective assistance of counsel.

**IV.** *Admission of Photograph*

Defendant contends that the trial court erred in admitting a black-and-white photograph depicting Tiffany's body at the scene of the accident. Defendant asserts that the photograph was unduly prejudicial and merely cumulative to testimony presented at trial. As explained below, we conclude that the trial court did not abuse its discretion in admitting the photograph.

**A.** *Background*

Before trial, the prosecutor moved to admit two photographs depicting Tiffany's body at the scene of the accident. The trial court looked at the photographs, and it stated that the photographs depicted "the victim laying on the pavement surrounded by blood." The prosecutor argued that admission of a photograph of Tiffany's body was necessary because it would demonstrate "the nature and severity of injuries she suffered[,] which goes to the element of the act being dangerous to human life." Defense counsel objected to the admission of the photographs, arguing that the photographs had little or no probative value, were extremely gruesome, would "distract the jury and inflame the passions and prejudices of the jury," and should be excluded pursuant to Evidence Code section 352.

During the course of his argument, the prosecutor stated that he would be satisfied if the trial court admitted just one photograph of Tiffany's body at the scene. The prosecutor provided the trial court seven such photographs. The trial court examined the photographs, and it selected the one it deemed the least prejudicial. The trial court explained: "Court is looking at all the photos. Court found one photo that was clearly

15

not as close up as the other photos in here and has it at a distance even though they're all disturbing; clearly not as disturbing as the ones close up." The trial court stated its intention to admit the photograph. Upon further objection from defense counsel, the trial court requested that the photograph be reproduced in black and white. Defense counsel stated that he objected to the admission of a black-and-white copy of the photograph.

The trial court viewed a black-and-white copy of the photograph, and it ruled that the black-and-white copy would be admitted. The trial court explained its ruling: "It's too prejudicial to allow the color copy which shows the red blood. The black and white copy is in the court's opinion nowhere near as disturbing as the color copy and shows . . . what [the prosecutor] needs to prove and highlight[s] how dangerous this action was and how a body reacts when it hits the pavement. [¶] And how there is a high probability of death and danger to human life. It can be accomplished through the black and white photo so that is allowed, not the color photo."

The black-and-white photograph was marked as People's Exhibit 13. It was published to the jury during an officer's testimony regarding the accident scene. Defense counsel reiterated his objection when the photograph was published to the jury.

### B. *The Trial Court Did Not Abuse its Discretion*

"The jury can, and must, be shielded from depictions that sensationalize an alleged crime, or are unnecessarily gruesome, but the jury cannot be shielded from an accurate depiction of the charged crimes that does not unnecessarily play upon the emotions of the jurors." (*People v. Ramirez* (2006) 39 Cal.4th 398, 454 (*Ramirez*).) Prosecutors "are not obliged to prove their case with evidence solely from live witnesses; the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case." (*People v. Gurule* (2002) 28 Cal.4th 557, 624 (*Gurule*).)

Photographs of murder victims "are admissible even if repetitive of other evidence, provided their probative value is not substantially outweighed by their

16

prejudicial effect." (*People v. Watson* (2008) 43 Cal.4th 652, 684.) Appellate courts "have rejected the contention that photographs of a murder victim must be excluded as cumulative simply because testimony also has been introduced to prove the facts that the photographs are intended to establish." (*People v. Crittenden* (1994) 9 Cal.4th 83, 134-135 (*Crittenden*).)

"The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory." (*Crittenden, supra,* 9 Cal.4th at p. 133.) "On appeal, we apply the deferential abuse of discretion standard when reviewing the trial court's ruling." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1136.) "A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value." (*Gurule, supra,* 28 Cal.4th at p. 624.)

Here, the trial court did not abuse its discretion in admitting the photograph of Tiffany's body. As defendant concedes, a disputed issue at trial was whether the natural and probable consequences of her conduct were dangerous to human life. As the trial court noted, the photograph of Tiffany's body—which depicted the consequences of the traffic accident—tended to show that defendant's act of drunk driving carried a high probability of death. Recognizing the relevance in the photograph, the trial court employed careful measures to minimize the prejudicial effect of the photograph. The trial court viewed several photographs of Tiffany's body, and it selected the photograph that was "clearly not as close up" as the other photographs and was shot at more of "a distance." The trial court noted that the selected photograph was "clearly not as disturbing" as the other photographs of Tiffany's body. In order to further minimize prejudice, the trial court ruled that the photograph would be admissible only in the form of a black-and-white copy. The trial court explained that the black-and-white copy of the photograph was "no where near as disturbing as the color copy." Given the trial court's

17

careful measures to minimize the prejudicial effect of the relevant photograph, we must conclude that the trial court did not abuse its discretion in refusing to exclude the photograph pursuant to Evidence Code section 352. (See generally *Ramirez, supra,* 39 Cal.4th at p. 454 [no abuse of discretion in admitting photographs where the record "reflects that the experienced trial judge was well aware of his duty to weigh the prejudicial effect of the photographs against their probative value, and carefully did so"].)

Finally, we are not persuaded by defendant's contention that the photograph was merely cumulative to testimony regarding Tiffany's death. Our Supreme Court has affirmed that prosecutors "are not obliged to prove their case with evidence solely from live witnesses," and that a jury is "entitled" to see photographs of a victim's body to determine if the evidence supports the prosecution's theory of the case. (*Gurule, supra,* 28 Cal.4th at p. 624.) We therefore find no error in the trial court's failure to exclude the photograph as cumulative. (See *Crittenden, supra,* 9 Cal.4th at pp. 134-135 [a victim photograph need not be excluded simply because testimony also has been introduced to prove the facts that the photograph is intended to establish].)

## V. *Cross-Examination of Defense Expert*

Defendant contends that the prosecutor committed misconduct in cross-examining the defense expert, Dr. Bruce Victor. Specifically, defendant asserts that the prosecutor improperly suggested that defendant was "wasting the jury's time and scarce public funds" in calling Dr. Victor as a witness. As explained below, we find no merit in defendant's claim.[2]

---

[2] The People contend that defendant forfeited her claim by failing to adequately object in the trial court. Recognizing a potential forfeiture issue, defendant alternatively asserts that defense counsel was ineffective in failing to adequately object. Because we can easily resolve defendant's claim on the merits, we will not address the issues of forfeiture or ineffective assistance.

18

**A.** *Background*

Dr. Victor provided expert testimony in which he described the differences between Oxycontin and Oxycodone.  On direct examination, Dr. Victor testified that he was being paid $375 an hour, and that he had never met defendant.

On cross-examination, Dr. Victor confirmed that defendant's own doctor, Dr. Lewis, could have testified regarding "what Oxycodone is" and "what Oxycontin is." The following then took place:

"[Prosecutor]:  But nonetheless you've been brought in to talk about those things; right?

"[Dr. Victor]:  Yes.

"[Prosecutor]:  Okay.  And you're getting paid $375 an hour to tell us what we could have asked the other doctor?

"[Defense Counsel]:  Objection your honor.  Argumentative as phrased.

"[Trial Court]:  Sustained.

"[Prosecutor]:  How many hours have you put into this?

"[Dr. Victor]:  I'm going to need to think about this for a second.  Probably in the neighborhood of ten or 12 hours.

"[Prosecutor]:  Ten or 12 hours.  So 3,500 bucks?

"[Dr. Victor]:  Not yet.

"[Prosecutor]:  So you never met with the defendant; correct?

"[Dr. Victor]:  No, that's correct.

"[Prosecutor]:  So you have never interviewed her?

"[Dr. Victor]:  No, I haven't.

"[Prosecutor]:  Did your review her medical files?

"[Dr. Victor]:  No.  But I did review other documents pertaining to her.

"[Prosecutor]:  What did you review?  You have it with you?

19

"[Dr. Victor]:  I do.

"[Prosecutor]:  Let me see if I could.  Thank you.  So you reviewed the police report and some interview transcripts; right?

"[Dr. Victor]:  That's correct.

"[Prosecutor]:  Did you need to do that in order to tell us what Oxycodone is?

"[Dr. Victor]:  No, I did not.

"[Prosecutor]:  Did you need to do that to tell us what Oxycontin is?

"[Dr. Victor]:  No.

"[Prosecutor]:  You didn't need to do that to do anything in terms of your analysis of the defendant, because you haven't analyzed the defendant; correct?

"[Dr. Victor]:  Correct."

### B. *The Prosecutor Did Not Commit Misconduct*

"The standards under which we evaluate prosecutorial misconduct may be summarized as follows.  A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

"The compensation and expenses paid or to be paid to an expert witness by the party calling him is a proper subject of inquiry by any adverse party as relevant to the credibility of the witness and the weight of his testimony." (Evid. Code, § 722, subd. (b).)  Thus, "it is not misconduct" when a prosecutor questions a defense expert "about payment for services." (*People v. Price* (1991) 1 Cal.4th 324, 457.)  Likewise, a defense expert "may be fully cross-examined" regarding "the matter upon which his or her opinion is based." (Evid.Code, § 721, subd. (a).)

Here, the prosecutor questioned Dr. Victor regarding the compensation he received for his testimony and the matter upon which his expert testimony was based. This line of questioning was proper and cannot be deemed misconduct. (See Evid. Code, §§ 721, subd. (a), 722, subd. (b).) We see nothing in the prosecutor's line of questioning that improperly suggested that defendant—who was represented by the public defender's office—was wasting the jury's time and public funds in calling Dr. Victor as a witness. Although the prosecutor asked Dr. Victor if he was being paid to supply testimony that could have been provided by Dr. Lewis, the trial court sustained a defense objection to that question, and the prosecutor made no further mention of Dr. Lewis or any other witness who could have supplied similar testimony. The prosecutor's line of questioning did not infect the trial with unfairness, nor did it involve deceptive or reprehensible methods. We therefore conclude that the prosecutor did not engage in misconduct in cross-examining Dr. Victor.

## DISPOSITION

The judgment is affirmed.

21

_____
RUSHING, P.J.

WE CONCUR:


_____
PREMO, J.


_____
MÁRQUEZ, J.