Filed 2/2/21  P. v. Nicholson CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C083498 |
| Plaintiff and Respondent, | (Super. Ct. Nos. STKCRFE20145067, SF127084A, SF127084B, STLCRFE20145066) |
| v. | |
| KYREN NICODEMUS NICHOLSON et al., | |
| Defendants and Appellants. | |

Defendants Kyren Nicodemus Nicholson and Bobby Sherell Miller went to the parking lot of an apartment complex where Miller fired a shotgun into Rashode Matthews's car.  Matthews, who was visiting a friend, left the friend's apartment shortly thereafter to pick up his wife from her job.  He encountered both defendants in the parking lot, where Nicholson shot him with a handgun four times, killing him.

1

Following a jury trial, Nicholson was convicted of second degree murder (Pen. Code, § 187)[1] with enhancements for personally and intentionally discharging a firearm, causing death (§ 12022.53, subd. (d)) and personally using and discharging a firearm (§§ 12022.5. subd. (a), 12022.53, subd. (b)), while Miller was convicted of second degree murder (§ 187) with enhancements for personally using a firearm (§§ 12022.5, subd. (a), 12022.53, subd. (b)). Nicholson was sentenced to 40 years to life and Miller was sentenced to 25 years to life.

On appeal, Miller contends there is insufficient evidence to support his murder conviction and firearm enhancements, the trial court had to instruct sua sponte on involuntary manslaughter as a lesser included offense, and trial counsel was ineffective for failing to request the instruction. Nicholson contends the court had a duty to instruct on voluntary manslaughter as a lesser included offense and trial counsel was ineffective for failing to request the instruction. Both defendants contend in supplemental briefs that their cases should be remanded to allow the trial court to exercise its discretion on whether to strike the firearm enhancements.

Although Miller fired the shotgun before Matthews went outside, his presence next to Nicholson with his sawed-off shotgun as Nicholson shot Matthews is substantial evidence to support his conviction and enhancements. There is no evidence to support either lesser included offense instruction. Since the trial court did not indicate an intent to impose the highest term possible, we shall affirm and remand to allow the court to exercise its discretion regarding the enhancements.

---

[1]     Undesignated statutory references are to the Penal Code.

BACKGROUND

*The Prosecution Case*

1. *The Crime*

Matthews went to his friend Jose Zamora's Stockton apartment on 4860 Kentfield Road at around 9:00 a.m. on February 17, 2014. Zamora lived with his wife, Kayla Lehr. Matthews lived a block away from his friend. As the men were in the apartment socializing, they heard the sound of a shotgun discharging two shots in the parking lot at the back of the apartment complex. About 10 minutes later, Matthews left the apartment to pick up his wife from her job.

Zamora heard another shot after Matthews left. He went outside where he saw Nicholson holding a black semiautomatic handgun in his left hand with a fully extended arm. After Matthews pleaded, "No, please don't shot me," Nicholson shot him two times. These shots had a different sound than the earlier shots, which sounded like shotgun blasts.

Zamora went back into his apartment and told Lehr he thought someone had been shot. Lehr had heard two shots from the parking lot. Zamora and Lehr went outside, where they saw Nicholson run down a walkway through the apartment buildings. Nicholson wore a gray zip-up hooded sweatshirt, jeans, white shoes, and a black hat or beanie worn backward. Lehr had seen Nicholson before at the apartment complex. When Lehr and Zamora got to the parking lot, they found an unresponsive Matthews lying on his stomach, with blood pooling under his body.

There are two sets of buildings in the apartment complex, 4850 Kentfield and 4860 Kentfield. Lence Watson and his wife Lachele Davis lived in an apartment at 4850 Kentfield. Watson worked in maintenance there. Watson was working outside that morning when he noticed a group of four young men approaching. Defendants, whom Watson had seen multiple times in the area, were two of the four young men. The men split into groups of two as they got closer to the complex, with defendants forming one of

3

the groups. One group went into 4850 Kentfield, while the other group went to 4860 Kentfield. Fifteen minutes later, at around 10:00 to 10:30 a.m., Watson heard a gunshot and glass breaking in the parking lot on the 4860 side. He went to the walkway, where he saw Miller standing in front of the gate to the 4860 side, looking around. Enough time had elapsed since the glass breaking for Miller to have walked there from the parking lot.

About 10 to 15 minutes later, Watson heard a man scream, "I ain't had nothing to do with it." As he walked toward the parking lot, Watson saw Miller shoving a 12- to 16-inch long sawed-off shotgun down the front of his pants. Miller wore a black or dark blue hooded sweatshirt and blue jeans. Miller started running toward a nearby park when he got to the complex gate. Watson went to the parking lot, where he found a man he had seen before lying face down, fighting to breathe and unresponsive.

Davis was in her apartment when she heard a shotgun go off. She looked out the window and saw a red Honda in the parking lot with a broken window; no one was in the parking lot. A little while later she heard two or three more gunshots. Looking out the window, Davis saw a man lying on his stomach with his hands up. The man yelled, "Why are you guys doing this?" as two men stood over him, with one near his head and the other by his knees. The man by the victim's knees, Miller, wore a black hoodie and black faded pants, while the man by the head wore a blue hooded sweatshirt and blue pants. Two more gunshots rang out, and the two men ran away. Miller, whom Davis knew from the neighborhood, put a sawed-off shotgun in his pants as he ran away. The other man, who was taller than Miller and slim, ran away in another direction.

Debbie Smith and her granddaughter Trisha Smith lived in the apartment adjacent to the parking lot at 4860 Kentfield. Debbie was downstairs around 10:30 a.m. when she heard multiple gunshots. Opening the front door and looking outside, she saw a person standing in the parking lot, firing a shotgun and wearing a black hooded sweatshirt. The man walked down the walkway between the apartment buildings, toward the street. Trisha was upstairs when she heard a gunshot and looked out the window. She heard a

4

man screaming, "Don't shoot me. I had nothing to do with it." After another gunshot, a man wearing a blue hooded sweatshirt and blue jeans ran down the walkway, past her apartment and toward the street.

2. *Investigation*

An officer arrived at the scene at about 10:40 a.m. and found Matthews lying face down in the apartment complex's rear parking lot. Two people were attempting to render aid. Matthews was pronounced dead at the hospital. He had sustained four gunshot wounds to his trunk and two to the extremities. Matthews was shot at least four times from a distance of 18 inches or more. He died from multiple gunshot wounds to the trunk. If the shooter was standing with a gun outstretched firing, then Matthews was fleeing when he was shot. Two expended nine-millimeter rounds were recovered from his body.

Lehr and Zamora identified Nicholson and Miller at a show-up on the afternoon of the shooting. Less than a month before the shooting, Zamora was sitting on a neighborhood park bench, talking with Matthews and his cousin. When Matthews saw Miller heading toward the park from across the street, he got up and walked away.

Watson identified both defendants at a show-up. Davis was brought into the police department separately and identified Miller.

Matthews's red Honda was found in the complex's parking lot, having sustained shotgun shots that broke the front driver and passenger side windows. Lying on the parking lot ground were nine-millimeter, .22-, .32-, .40-, and .45-caliber shell casings as well as four pellets.

Officers found two Facebook accounts associated with defendants. The accounts were linked as friends. Miller's account had numerous photos of him alone and of him with Nicholson. It contained a photo of Miller and Nicholson standing at the entrance of the parking lot at 23 Gateway Court, with Miller holding a handgun and Nicholson holding a shotgun. This picture was also used as an Instagram cell phone application

5

icon for the user "gblaccloc44," having been posted the day before the shooting. A cell phone account with this user name had many of the same photos as found in Miller's account. Both defendants' Facebook accounts were deleted on the day of the shooting.

A search of an apartment at 23 Gateway Court found a blue hooded sweatshirt and a black hooded sweatshirt. A search of another residence during an unrelated robbery investigation discovered a nine-millimeter semiautomatic pistol. The occupants of the residence were in custody at the time of the shooting. The gun matched three of the casings found at the parking lot, but the bullets from the autopsy could not be identified as they had no distinguishing marks.

3. *Defense*

No gunshot residue was found on either defendants' hands after they were arrested on the day of the shooting. Miller's Facebook account was reactivated after he was arrested and taken into custody. Miller had his cell phone for a few hours while he was being interviewed but it was later taken away.

DISCUSSION

I

*Substantial Evidence Supports Miller's Conviction*

Miller was convicted of second degree murder under an aiding and abetting theory. He contends there is insufficient evidence to support his conviction.

The standard for judicial review of a criminal conviction challenged as lacking evidentiary support is well established: "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We will not substitute our conclusions for those of the trier of fact. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.) A conviction will not be reversed for insufficient evidence unless it appears " 'that upon no

6

hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"To prove that a defendant is an accomplice, . . . the prosecution must show that the defendant acted 'with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' [Citation.]" (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.) "When the offense charged is a specific intent crime, the accomplice must 'share the specific intent of the perpetrator'; this occurs when the accomplice 'knows the full extent of the perpetrator's criminal purpose *and* gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.' [Citation.] . . . [A]n aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' [Citation.]" (*Ibid.*)

"Among the factors which may be considered in determining aiding and abetting are:  presence at the crime scene, companionship, and conduct before and after the offense." (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5.) "In addition, flight is one of the factors which is relevant in determining consciousness of guilt.  [Citation.]" (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1095.)

" 'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.]" (*People v. Elmore* (2014) 59 Cal.4th 121, 133.) "Malice may be either express (as when a defendant manifests a deliberate intention to take away the life of a fellow creature) or implied.  [Citation.]  'Malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who

7

acts with conscious disregard for life.' " [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another . . . .' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 507.)

Miller's claim is based on the apparent lack of motive and the lack of direct evidence that he knew Matthews would be shot and killed and intended to facilitate that conduct. Multiple witnesses placed Miller and Nicholson together just before and during the shooting, with Nicholson firing the murder weapon. Miller was seen holding the sawed-off shotgun before the killing and putting the weapon into his pants as he fled. Witnesses also heard a shotgun fired several minutes before Matthews was shot, and Matthews's red Honda, which was in the parking lot where he was killed, had sustained damage from a shotgun being fired at it.

A jury could reasonably infer that Miller fired the shotgun at Matthews's car, which could be an attempt to draw Matthews to the parking lot and to deter him from trying to escape in his car after confronting the two armed defendants. Miller was armed and accompanied Nicholson as the two waited for Matthews before Nicholson shot a pleading, fleeing Matthews at least four times, killing him. Displaying a firearm helps the perpetrator commit the murder by further dissuading the victim from resisting and reduces the victim's chance of fleeing to safety. Miller's shared purpose with Nicholson is further supported by the social media evidence showing the two each holding firearms in a photo posted shortly before the shooting. His and Nicholson's mutual flight from the scene, along with the deletion of the Facebook account, shows a guilty mind.

The evidence shows Miller helped Nicholson ambush Matthews and murder him while sharing Nicholson's intent to kill. Substantial evidence supports his conviction for second degree murder.

## II

### *Substantial Evidence of Miller's Enhancements*

Miller next contends there is insufficient evidence that he used his firearm to support his enhancements under sections 12022.5, subdivision (a) and 12022.53, subdivision (b).

Both sections provide for an enhancement for defendants who personally use a firearm during the commission of an offense. Section 12022.5, subdivision (a) applies to any felony, while section 12022.53, subdivision (b) applies to the personal use of a firearm during certain specified felonies, in this case, murder. (§§ 12022.5, subd. (a), 12022.53, subds. (a)(1), (b).) Enhancements are reviewed for substantial evidence under the same standard as for criminal convictions. (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

A defendant "personally uses a firearm" if there is some nexus between the offense and the firearm, such that the firearm was an instrumentality of the crime. (*People v. Lerma* (1996) 42 Cal.App.4th 1221, 1226.) " 'Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies. "Use" means, among other things, "to carry out a purpose or action by means of," to "make instrumental to an end or process," and to "apply to advantage." [Citation.]' " (*People v. Bland* (1995) 10 Cal.4th 991, 997.) "[A] firearm-use allegation may be established as true if the defendant 'utilized the gun at least as an aid in completing an essential element of the [underlying] crime . . . .' [Citation.]" (*In re Tameka C.* (2000) 22 Cal.4th 190, 197.) "Whether a gun is 'used' in the commission of an offense . . . is broadly construed within the factual context of each case. There are no precise formulas, or particular fact patterns to follow, to determine whether a gun has been 'used' for

9

purposes of a sentence enhancement." (*Alvarado v. Superior Court* (2007) 146 Cal.App.4th 993, 1002, fn. omitted.)

As our discussion of the sufficiency of the evidence for his murder conviction shows, Miller used the sawed-off shotgun to aid and abet the commission of the murder by trying to draw the victim out and diminish his chances of escape. These same facts likewise support a true finding on the two gun use enhancements.

### III

### *No Duty to Instruct on Manslaughter*

Miller contends the trial court had a duty to instruct sua sponte on involuntary manslaughter as a lesser included offense and Nicholson contends the court had a duty to instruct sua sponte on voluntary manslaughter as a lesser included offense.

"Even without a request, a trial court must instruct on general principles of law that are closely connected to the facts before the court and that are necessary for the jury's understanding of the case. [Citation.] It must instruct sua sponte on a lesser included offense where there is evidence that, if believed by the trier of fact, would absolve the defendant of the greater offense, but not of the lesser. [Citation.] This obligation extends to all theories of a lesser included offense that find substantial support in the evidence. [Citation.] However, the court need not instruct on a lesser offense when there is no evidence the offense was less than that charged. [Citation.]" (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 833, disapproved on other grounds in *People v. Dalton* (2019) 7 Cal.5th 166, 214.)

"Manslaughter is 'the unlawful killing of a human being without malice.' (§ 192.) A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense"— the unreasonable but good faith belief in having to act in self-defense. [Citations.]' [Citation.]" (*People v. Blakeley* (2000) 23 Cal.4th 82, 87-88.)

10

A defendant commits involuntary manslaughter when a reasonable person objectively "would have been aware of the risk" inherent in the defendant's actions, but the defendant did not grasp the risk. (*People v. Butler* (2010) 187 Cal.App.4th 998, 1008.) This culpable lack of awareness is sometimes described as criminal negligence. " ' "[C]riminal negligence" ' exists when the defendant engages in conduct that is ' "aggravated, culpable, gross, or reckless" '; i.e., conduct that is ' "such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences." ' " (*Ibid*.) Thus, "if the defendant commits an act which endangers human life without realizing the risk involved, he is guilty of [involuntary] manslaughter, whereas if he realized the risk and acted in total disregard of the danger, he is guilty of murder based on implied malice. [Citations.]" (*People v. Cleaves* (1991) 229 Cal.App.3d 367, 378.)

We apply the de novo standard of review when evaluating an appeal that contends the trial court should have instructed sua sponte on a lesser included offense. (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.) When considering whether the trial court had a duty to instruct on a lesser included offense, we view evidence in the light most favorable to defendant. (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1368, fn. 5.)

There is no evidence to support either defendant being guilty of the variant of manslaughter they claim rather murder. "[T]o warrant instructions on provocation and heat of passion, there must be substantial evidence in the trial record to support a finding that, at the time of the killing, defendant's reason was (1) actually obscured as a result of a strong passion; (2) the passion was provoked by the victim's conduct; and (3) the provocation was sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, and from this passion rather than from due deliberation or reflection. [Citations.]" (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1481.)

While Matthews's pleas before his murder is evidence of some motive, there is no evidence he provoked the killing, of any sudden quarrel between him and either defendant, or any act from him which would support a theory of imperfect self-defense. Nicholson's claim is without merit.

Miller's claim, based on the alleged lack of malice to be inferred from his acts, is little more than rehashing the substantial evidence attack on his murder conviction. There is no evidence that Miller acted with criminal negligence rather than the mental state necessary for second degree murder as an aider and abettor, and there is no evidence he did not understand the danger of his actions. Instruction on involuntary manslaughter was not appropriate.

IV

*No Ineffective Assistance*

Both defendants contend that, in addition to the trial court having a duty to instruct sua sponte on manslaughter, their respective trial counsel was ineffective for failing to request instruction on voluntary manslaughter as to Nicholson and involuntary manslaughter as to Miller.

"Counsel is not ineffective for failing to make frivolous or futile motions." (*People v. Thompson* (2010) 49 Cal.4th 79, 122.) Since the evidence did not support an instruction on any form of manslaughter, the failure of either trial counsel to request a manslaughter instruction did not constitute ineffective assistance.

V

*Senate Bill No. 620*

In supplemental briefs, both defendants contend the matter should be remanded to allow the trial court to exercise its discretion on whether to strike the firearm enhancements.

On October 11, 2017, the Governor signed Senate Bill No. 620. As relevant here, Senate Bill No. 620 provides that effective January 1, 2018, sections 12022.53 and

12

12022.5 are amended to permit the trial court to strike an enhancement in the interests of justice. (§ 12022.5, subd. (c), 12022.53, subd. (h).) Prior to this amendment, an enhancement under sections 12022.53 and 12022.5 was mandatory and could not be stricken in the interests of justice. (See, e.g., *People v. Kim* (2011) 193 Cal.App.4th 1355, 1362-1363; *People v. Felix* (2003) 108 Cal.App.4th 994, 999.)

The amendment to sections 12022.53 and 12022.5 applies retroactively to cases not final on appeal. (*People v. Arredondo* (2018) 21 Cal.App.5th 493, 507; *People v. Woods* (2018) 19 Cal.App.5th 1080, 1090-1091.) When a trial court is unaware of sentencing discretion, the appropriate remedy is to remand for the court to exercise its discretion. (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.) In the case of Senate Bill No. 620, a remand is required unless the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken a firearm enhancement. (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 427-428.)

Since the trial court did not indicate it would impose the highest sentence possible or in any way indicate remand would be futile, we shall remand for the trial court to exercise its discretion over the enhancements.

DISPOSITION

The matter is remanded to the trial court to consider whether to exercise its discretion to strike defendants' firearm enhancements.  The judgment is otherwise affirmed.

    /s/               

BLEASE, Acting P. J.

We concur:

    /s/             

MAURO, J.

    /s/             

RENNER, J.