Filed 3/25/26  P. v. Davis CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B338872 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA097439) |
| v. | |
| ROY DAVIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Kathryn Solorzano, Judge.  Affirmed.

Adrian Dresel-Velasquez, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Michael C. Keller and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

# I.    INTRODUCTION

Defendant Roy Davis appeals from a judgment of conviction on two counts of second degree murder, arguing the prosecutor engaged in misconduct by allowing the jury to review unredacted transcripts of defendant's telephone conversations from jail that contained prejudicial admissions.  He also contends the trial court should have instructed the jury on the lesser included offense of involuntary manslaughter and further erred by preventing him from arguing to the jury that mental impairment evidence could negate a finding of implied malice.  We affirm.

# II.    FACTUAL BACKGROUND[1]

## A.    *Murder of John Hautz*

On December 28, 2017, around 8:45 a.m., defendant awoke at the site of a partially demolished house in Santa Monica.  He walked into the backyard, grabbed a pickax and a shovel, and used the pickax to break through the side fence and enter the adjacent property.  Next door, the occupants came outside and defendant asked them for food.  Both observed that defendant was carrying a pickax.  When they asked him to drop it, defendant responded, "'I have not broken into your house to get this pickax.'"  Defendant appeared to be under the influence of a drug based on his behavior, his shaky hands, and the way his eyes looked.  He dragged his feet as he walked.

---

[1]    We recite the facts from the trial record in the light most favorable to the judgment.  (*People v. McGehee* (2016) 246 Cal.App.4th 1190, 1195 (*McGehee*).)

On January 1, 2018, the Santa Monica Fire Department responded to the apartment of 88-year-old John Hautz. When they found the front door locked from the inside with a chain, they forced entry and found the body of Hautz lying on the floor. A deputy medical examiner determined the cause of death to be multiple traumatic injuries, including "massive fatal chopping wounds to the left skull and the left chest" consistent with the use of a pickax.

Hautz's next-door neighbor reported to the Santa Monica Police Department that he had found a pickax on his property under some bushes a couple of days earlier. He remembered that the home's sensor lighting was triggered during the early morning hours on December 29, 2017; he found the pickax the next day. The police found Hautz's blood on the head of the pickax.[2] They also found a shovel from the demolition site in the driveway of a nearby property. Defendant's DNA was on the handle.

In addition, the police found Hautz's blood on his living room floor and on the front door chain which, as previously noted, was locked from the inside. The police observed that "the back window, which was open and the screen, the seal around the screen had been removed which would have been able to fit a person inside or outside." Defendant's DNA was found on the metal window frame and the rubber window screen lining. After his arrest, defendant allowed officers to take his fingerprints, but he refused to allow them to take palm prints. A forensic specialist lifted a palm print from the sliding closet door of

---

[2]    A forensic specialist retrieved a partial profile of DNA from the handle of the pickax that matched defendant as a possible contributor.

Hautz's bedroom and matched it to defendant's right palm using a print previously lifted from defendant and stored in a police database.

B.    *Murder of Kenneth Schmitt*

On January 13, 2018, around 9:00 a.m., a man bicycling past the iron fence of a nightclub on Hollywood Boulevard observed defendant strike a woman[3] four times on the head with a water bottle while she lay on her side under a blanket behind the fence.  He heard the woman say "No.  No.  No.  No," as defendant struck her.  A few hours later, Los Angeles Police Department officers found the body of Kenneth Schmitt lying behind the same iron fence.  A deputy medical examiner determined the cause of death to be multiple stab wounds.[4] Schmitt sustained defensive wounds to both hands.  Defendant's DNA was underneath Schmitt's fingernails.

Surveillance video showed Schmitt entering the area beyond the iron fence around 6:00 a.m.  Around 8:18 a.m., defendant slowly walked toward the nightclub, dragging his feet.  He was holding a pair of white headphones with blue tape on the

---

[3]    The victim, Kenneth Schmitt, was a thin man with long hair who was wearing makeup at the time of death.

[4]    Schmitt sustained blunt force trauma to the torso and extremities.  He had incision-type injuries on the upper torso, collarbone, and shoulder.  He sustained 101 stab wounds, including 67 to the chest, nine to the neck, and one to the right temple that penetrated through the temporal muscle and was stopped by the temporal bone.  The deepest wound was two and a quarter inches.

4

headband portion. Defendant crossed over the low fence in front of the nightclub and climbed into the area where Schmitt had entered two hours prior. Six minutes later, defendant reappeared at the front of the nightclub. He jumped over the low fence and ran away but was no longer holding the white headphones. A red stain was visible on his pants. As he ran from the scene, defendant placed a scarf over his head. Another six minutes passed before defendant reappeared in different clothing. He ran back toward the nightclub covering his head with a jacket. He ran toward the area where officers later found Schmitt, retrieved his headphones, and fled.

## III.   PROCEDURAL BACKGROUND

The Los Angeles County District Attorney charged defendant with two counts of murder in violation of Penal Code[5] section 187, subdivision (a). The District Attorney alleged as to both counts, that defendant used a deadly weapon in the commission of the offenses within the meaning of section 12022, subdivision (b)(1). The District Attorney also alleged a multiple-murder special circumstance pursuant to section 190.2, subdivision (a)(3).

The jury found defendant not guilty on both counts of murder in the first degree. The jury found defendant guilty on both counts of murder in the second degree and found the weapon

---

[5]    All further statutory references are to the Penal Code unless otherwise indicated.

5

allegations true. The jury found the multiple-murder special circumstance allegation not true.[6]

The trial court sentenced defendant to 32 years to life in state prison, which consisted of two consecutive 15-year-to-life terms for the murder counts, plus one year each for the two weapon enhancements.

## IV.  DISCUSSION

A.  *Unredacted Transcripts*

The parties agree that the prosecutor erred when she distributed unredacted jail call transcripts to the jury to use while they listened to edited jail calls. Defendant argues that this error violated his Sixth Amendment right to an impartial jury as well as his due process rights.

### 1.  Background

At trial, the prosecution sought to introduce into evidence four of defendant's post-arrest telephone calls. The defense objected to the introduction of the telephone calls and, following argument, the court ordered the prosecution to excise portions of two of the phone calls, namely, portions of defendant's August 4, 2018, and August 6, 2018, telephone calls with his mother. We set forth below the relevant portions of the unredacted transcripts of the two telephone calls that were provided to the

---

[6]  Defendant was no longer eligible for the special circumstance, which required at least one conviction for first degree murder.

6

jury, italicize the portions of the calls that the court ordered the prosecutor to excise from the recording, and include a footnote where our review of the recording conflicts with the transcript:

<u>August 4, 2018, telephone call</u>

"[Defendant:]  But I'm gonna tell you something real quick . . . but you gotta understand the subliminals, okay?

"[Mother:]  No.

"[Defendant:]  Heh, heh, heh!  I [unintelligible] just gonna tell you real quick while they . . . .

"[Mother:]  I—I'm—I'm scared I might not understand and somebody else might understand.

"[Defendant:]  Nah, ain't nobody gonna know what I'm saying.[7]  Do you know the roaches—they say I have two roaches, right?

"[Mother:]  Yeah—

"[Defendant:]  They—they say I got two roaches and I'm going to court for two roaches. You understand me?

"[Mother:]  Yes!

"[Defendant:]  Mother!  To be honest with you—

"[Mother:]  . . . I know—

"[Defendant:] . . . to be honest—

"[Operator:]  . . . this call is being recorded—

"[Defendant:]  . . . to be honest with you, [m]other, it was *like nine roaches and* they caught me for two roaches.

"[*Mother*:]  *I already knew that.*

"[*Defendant*:]  *Oh, you did?*

---

7    The recording reflects defendant stated, "Nah, ain't nobody gonna understand."

7

"[*Mother*:]  Yep.

"[*Defendant*:]  Dang.

"[*Mother*:]  I—I already knew.  I—I know about—ahem—I *know about the extra roaches.  I see everything through your eyes. I already know*—

"[Defendant:]  . . . yeah . . . that's why I say it's a blessing to do—be hav—just to have—be doing the—that's why I be smiling and laughing—like—man, it's a blessing just to . . . hold—be held down for two roaches.  You know what I'm saying?  You understand me, [m]other?

"[Mother:]  I do . . . [.]

"[Defendant:]  Yeah, it's a blessing 'cause I'm still gotta attempt to get out.  This dude—this dude on the news just got caught for seven roaches.

"[Mother:]  That's enough."

August 6, 2018, telephone call

During their next conversation, mother said she "could only imagine what you have on your shoulder" and "it's something beyond belief that [she] could ever believe."  Mother then told defendant that she loved him for being honest but that she did not want him to talk about the case anymore on the phone because she knew it was being recorded and she did not want to give the other side anything that could be used against him. Defendant responded, "Yeah.  It was a drug, though.  That crystal drug."  Later, defendant and mother had the following exchange:

"[Defendant:]  Yeah.  I—I'm—once they—once they give me my time—once I get my—once I figure out how much time I'm

8

getting this stuff and I can get my time started, I'd be so well adjusted and cool. You know what I'm saying? Just—just the waiting game is—is—is—is the problem, you know. Today—

"[*Mother*:] *So, but Roy one question I do have to ask you. So, what if you—what if you don't get—what if you get to the point where you don't get the opportunity to get out?*

"[*Defendant*:] *I'm gonna have to do what I got to do.*

"[*Mother*:] *Right.*

"[*Defendant*:] *Yeah. You're right.*

"[Mother:] But you need to look at it, at all angles and quit wishing and hoping on something that might be inevitable and just face reality that shit has went down and some shit might happen behind the shit that went down. And that's the only way I know how to put it nicely.

"[Defendant:] Yeah. You're right. You're right."[8]

There was a bit more conversation and the recording ended with this exchange:

"[Defendant:] . . . So, I just have to tell you the truth. I'm like, man, let me tell her the truth, you know what I'm saying?

"[Mother:] Yeah. I understand, Roy, because we've always had that connection. You guys have always been able to be open and honest with me, but I wish that was something I would have found out on a visit instead of on this line.

"[Defendant:] Yeah.

"[Mother:] I don't want nothing the defense can use against you to be recorded on this line. You know what I'm saying? *The two—the two is enough right now.*

"[Defendant:] *Yeah.*

---

[8]    The recording reflects defendant stated, "Yeah. You're right."

"[Mother:]  *The two is enough, you know, they don't need that extra.*

"[Defendant:]  *Yeah.*

"[Mother:]  That's why I don't want you to ever speak of it again.  Never, ever, ever, ever.[9]

"[Defendant:]  Yeah."

During argument regarding the admissibility of the telephone calls, the trial court offered to give an admonishment that there was no evidence connecting the defendant with other murders.  Defense counsel considered the matter overnight and declined the admonishment because "[nothing] the court could say would eliminate the prejudice . . . ."

On November 14, 2023, the prosecutor played the jail calls, which the parties agree were properly excised in accordance with the trial court's ruling, but the prosecutor provided unredacted transcripts to the jury to use as an aid while they were listening to the audio recording.[10]  The court admonished the jury that the transcript was not evidence, only the recording was evidence.  "So if you're listening to the audio recording and you hear something that's not consistent with the transcript, . . you decide what was said.  Okay?  Not the person who transcribed for your ease. . . . [¶]  . . . [¶]  . . . Don't start reading it the minute it's in your hand because, again, that's counter to what I'm saying that the transcript is not evidence."  Defense counsel did not object to the

---

[9]     The recording reflects mother stated, "Never, ever, ever."

[10]     The clerk marked as exhibit 29 the DVD labeled "Jail Calls" and admitted it into evidence.  The transcripts at issue on appeal, marked 29b and 29c, were marked for reference and were not admitted into evidence.

prosecutor providing the jury with the erroneous transcripts; and, it appears, no one noticed the error until defendant appealed from his conviction.

### 2.    Forfeiture

To preserve a claim of prosecutorial misconduct for appeal, a defendant must raise a contemporaneous objection at trial and seek a jury admonition or else forfeit the claim.  (*People v. Avila* (2009) 46 Cal.4th 680, 710–711; *People v. Bonilla* (2007) 41 Cal.4th 313, 336.)  "It is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided." (*People v. Vera* (1997) 15 Cal.4th 269, 276; accord, *People v. Saunders* (1993) 5 Cal.4th 580, 589–590.)

Defendant did not object to the jury being provided with the unredacted transcripts.  He argues, however, that counsel "cannot be faulted for failing to object" because the record does not demonstrate that he knew the transcripts provided to the jury were not redacted and the error was so prejudicial that no admonition would have cured the error.  We reject defendant's contention that the "duty to object must be premised on knowledge that the error is actually occurring" as it is not supported by any case authority.  Further, we reject his contention that an objection would not have cured the error.  Had defendant timely brought the prosecutor's error to the attention of the trial court, it could have prevented the error by either ensuring the jurors did not view the unredacted transcripts or remedying the error after the fact by issuing an admonition.  (See *People v. Crew* (2003) 31 Cal.4th 822, 839 ["a claim of

11

prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury"].) Further, the court could have explained the inconsistency in the transcripts as an error and told the jury to disregard it. Because we conclude the court could have prevented or remedied the error if defendant had objected during trial, we conclude that defendant forfeited this claim of error.

### 3. Ineffective Assistance of Counsel

Defendant argues that, if we conclude he has forfeited his claim regarding the unredacted jury transcripts, we should reverse his convictions based on ineffective assistance of counsel. He maintains that counsel was constitutionally ineffective for failing to object to the publication of unredacted transcripts to the jury.

A criminal defendant's Sixth Amendment right to counsel includes the right to effective legal assistance. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) A defendant asserting ineffective assistance of counsel must show (1) his counsel's "performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms," and (2) "resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*Ibid.*) "'[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice,

12

which we expect will often be so, that course should be followed.' (*Strickland v. Washington* (1984) 466 U.S. 688, 697.)" (*People v. Carrasco* (2014) 59 Cal.4th 924, 982.)[11]

We consider whether defendant can demonstrate prejudice, assuming that counsel's performance was deficient. The evidence regarding defendant's identity as the killer was overwhelming. Indeed, as defendant concedes, his trial "counsel never argued that [defendant] did not commit the killings in this case. Instead, his successful defense strategy was to argue that his mental disease negated any express malice and reduced the murders from first degree down to second degree." The jury agreed with

---

[11]     Defendant contends that we should presume prejudice by analyzing the error as one of jury bias. (*People v. Marshall* (1990) 50 Cal.3d 907, 949.) We disagree. "When, as in this case, a jury innocently considers evidence it was inadvertently given, there is no misconduct. The situation is the same as any in which the court erroneously admits evidence." (*People v. Cooper* (1991) 53 Cal.3d 771, 836 (*Cooper*); e.g., *People v. Gamache* (2010) 48 Cal.4th 347, 399 [court's inadvertent submission of a videotape, which was not in evidence, to the jury was ordinary error and not juror misconduct] (*Gamache*); *People v. Jordan* (2003) 108 Cal.App.4th 349, 364 [court's inadvertent submission of parole information to the jury was ordinary error]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1213 [clerical error resulted in the jury receiving an unredacted transcript of the defendant's statements].) In the absence of juror misconduct, the burden remains with the defendant to demonstrate prejudice under the usual standard for ordinary trial error. (*Cooper*, *supra*, 53 Cal.3d at p. 836; *Gamache*, *supra*, 48 Cal.4th at p. 397.) "Such error is reversible only if it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error. [Citations.]" (*Cooper*, *supra*, 53 Cal.3d at p. 836.)

counsel and found that defendant lacked the intent necessary for first degree murder and convicted him of second degree murder. Further, because the jury acquitted defendant of both charges of first degree murder, defendant was ineligible for the special circumstance that carried a sentence of life without parole and the jury accordingly returned a not true finding on that allegation. Therefore, the erroneous inclusion of the redacted language in the transcript, even if it was noticed and discussed by the jury, did not prejudice defendant at trial.

B. *Failure to Instruct on Involuntary Manslaughter*

1. <u>Background</u>

Defendant asserts the trial court erred when it failed to instruct the jury on the lesser included offense of involuntary manslaughter.

In opening statement, defense counsel advised the jury that the evidence would show defendant suffered from schizophrenia and was using crystal methamphetamine at the time of the crimes, both of which caused him paranoia and delusions. Counsel told the jury: "If you find that [defendant], in fact, is involved in these killings, I believe that you're going to find based upon the evidence that these murders are not of the first degree. That these murders are, in fact, of the second degree for two reasons: one, that you'll find that he was under the influence at the time, ingesting narcotics; and two, that he was suffering from delusions and hallucinating."

14

During trial, defendant presented testimony from four psychiatrists and one psychiatric nurse who treated him both before and after the murders.  One clinical psychiatrist, Dr. Markie, testified that he treated defendant as an inpatient between November 28, 2017, and December 2, 2017, prior to the charged murders.  According to Dr. Markie, defendant admitted himself to the hospital because he was suicidal and wanted to detox from drug use.  Defendant was paranoid and hearing voices.  Dr. Markie diagnosed defendant with "schizoaffective disorder, depressed, polysubstance abuse and dependence" and prescribed him an antipsychotic medication.  The hospital released defendant on December 2, 2017, after he showed noticeable improvement.

Dr. Gessesse, a clinical psychiatrist, testified that he treated defendant after the charged murders, between January 23, 2018, and February 1, 2018, while defendant was placed on a Welfare and Institutions Code section 5150 hold (5150 hold) for suicidal ideation.  Dr. Gessesse had an initial working diagnosis of "unspecified schizophrenic spectrum" which "means that [defendant was] demonstrating symptoms of psychosis [that were] not fully consistent with schizophrenia until further investigation."[12]  He prescribed antipsychotic medication, but defendant sometimes refused to take it.  Defendant showed no improvement from his paranoid psychosis and suicidal ideation until January 29, when he became

_____

[12]    Dr. Gessesse explained that a proper diagnosis of schizophrenia requires a six-month observation period during which the patient must exhibit diagnostic symptoms for at least a one-month period.

15

medication compliant. Defendant was released from the hospital on February 1, 2018.

Two emergency room psychiatrists and one psychiatric registered nurse testified that they treated defendant on February 5, 2018, when he was again placed on a 5150 hold. Dr. Jones observed defendant was paranoid and suicidal, a danger to himself but not to others. Dr. Cobb observed defendant was "'guarded with rambling, nonsensical speech and limited insights into his bizarre thought content'" consistent with a "psychotic spectrum illness." Defendant was hallucinating and responding to internal stimuli. Dr. Cobb testified that his initial diagnostic impression[13] was schizophrenia and other psychotic disorders rather than a substance induced psychotic disorder. A psychiatric registered nurse testified that she observed defendant on February 5, 2018, screaming, cursing, and talking nonsensically; he appeared paranoid and delusional.

Defendant introduced a portion of the May 10, 2018, phone conversation between the defendant and mother in which defendant stated, "I don't remember nothing the day or how it happened but I know I snapped."

During the jury instruction conference, the trial court stated that it "[didn't] see an avenue and based on what I have read this morning, for an involuntary manslaughter." The court explained, "the reason why [defendant's] not getting instructions anything other than murder in this case is because obviously there's no evidence to support any kind of justification or excuse." The next day, the court repeated its conclusion that "in this particular case, [defendant] really [had not] drawn any nexus

---

[13] Like Dr. Gessesse, he acknowledged that it takes six months of observation to diagnose schizophrenia.

whatsoever" between the observations and diagnoses of the mental health experts and "any type of specific effect that that would have [had]" on how defendant "behaved on the date in question."

At defendant's request, however, the trial court instructed the jury that mental impairment was a defense to specific intent or mental state. The court instructed the jury to consider evidence that defendant may have suffered from a mental disorder "only for the limited purpose of deciding whether, at the time of the charged crimes, . . . defendant acted with the intent or mental state required for each crime. [¶] . . . specifically: malice aforethought or if . . . defendant acted willfully, deliberately, and with premeditation as required for a finding of first degree murder." (See § 28, subd. (a).) The court instructed the jury that it could consider evidence of hallucinations or delusions, but only in deciding whether the defendant acted with deliberation and premeditation, i.e., committed first degree murder, but not to negate malice aforethought. The court also instructed the jury on voluntary intoxication and its potential to negate express malice and premeditation. The court instructed that voluntary intoxication is not a defense to implied malice murder. (See § 29.4, subd. (b).)

2.    Legal Principles

"We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense." (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.) Involuntary manslaughter is an unlawful killing caused by a defendant who committed an act that endangered human life

17

without realizing the risk or danger involved, i.e., with criminal negligence. (*People v. Cleaves* (1991) 229 Cal.App.3d 367, 378.) A trial court should instruct on involuntary manslaughter as a lesser included offense if there is sufficient evidence for a reasonable juror to find the defendant acted without intent to kill and without consciously realizing the risk to the victim's life. (*People v. Evers* (1992) 10 Cal.App.4th 588, 596 (*Evers*); *People v. Smith* (2021) 70 Cal.App.5th 298, 312.) However, "if the evidence supporting the lesser included offense is 'minimal and insubstantial the court need not instruct on its effect.' [Citation.]" (*Evers, supra,* 10 Cal.App.4th at p. 595.) Thus, if "the defendant indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, and no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed, there is no sua sponte duty to instruct on involuntary manslaughter." (*People v. Brothers* (2015) 236 Cal.App.4th 24, 35 (*Brothers*); cf. *People v. Cook* (2006) 39 Cal.4th 566, 597 [where the defendant "savagely beat" the victim to death and "the evidence presented at trial did not raise a material issue as to whether defendant acted without malice" the involuntary manslaughter instruction was not required] (*Cook*).)

3.    Analysis

The manner in which one kills can be so severe that no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her

18

conduct posed.  In *McGehee*, *supra*, 246 Cal.App.4th 1190, the court found no error when the trial court declined to give an involuntary manslaughter instruction because there was insufficient evidence that defendant lacked intent to kill, despite evidence of his mental illness which included a diagnosis of schizophrenia, because he stabbed his mother ten times in the head, neck and abdomen in a manner described by the medical examiner as "'overkill.'"  (*Id*. at p. 1208.)  Eight of the wounds were independently fatal.  (*Ibid*.)  The court explained, "There can be no serious dispute defendant intended to kill when he did this to his mother."  (*Ibid*.)

In *Brothers*, *supra*, 236 Cal.App.4th 24, defendant beat the victim repeatedly on the head and face with a large wooden broom handle with great force, causing blunt force trauma, stopping only after defendant had stopped moving.  (*Id*. at p. 28.)  The court observed that "[t]here was no evidence of an accidental killing, gross negligence or [the defendant's] own lack of subjective understanding of the risk to [the victim's] life that her and her confederates' conduct posed.  On this record, the trial court had no sua sponte duty to instruct the jury on involuntary manslaughter."  (Cf. *Cook*, *supra*, 39 Cal.4th at p. 597; *People v. Guillen* (2014) 227 Cal.App.4th 934, 1027 ["the record is devoid of evidence from which a reasonable jury could conclude appellants were guilty of involuntary manslaughter on the theory they were criminally negligent"].)

Here, there was insufficient evidence from which a reasonable juror could entertain a reasonable doubt that defendant lacked malice and had merely acted in conscious disregard of the risk his conduct posed to the lives of Hautz and Schmitt.  The manner in which defendant killed Hautz and

19

Schmitt was more egregious than in *McGehee, supra,* 246 Cal.App.4th 1190 and *Brothers, supra,* 236 Cal.App.4th 24 and therefore clearly demonstrated his intent to kill. With respect to Hautz, the evidence showed that defendant armed himself with a pickax before entering the home. He used the pickax to strike heavy blows to Hautz's head and chest, locked the front door from the inside with the chain, and exited through a back window to avoid detection and delay discovery of the murder. He removed the murder weapon from the scene and concealed it in the bushes of the neighbor's property. When he was apprehended, he refused to give a palm print but willingly gave fingerprints, indicating that he had the clarity of mind to recall he had left a palm print at the crime scene.

As to Schmitt's murder, the evidence showed defendant killed him by stabbing him with a knife over 100 times, nine times in the neck and 67 in the chest. Schmitt's defensive wounds demonstrated that he actively struggled with defendant. Surveillance video showed defendant had the presence of mind to run from the scene, cover his head, and change out of his bloody clothes to avoid detection. He also had the presence of mind to realize that he had left his headphones at the scene and return to retrieve them.

As in *McGehee, supra,* 246 Cal.App.4th 1190, defendant's intent to kill both victims in this case was obvious from the methods of attack and ensuing conduct. Although defendant provided evidence of his mental illness, he presented no alternate explanation for his goal-oriented behavior during the murders. His recorded statements contained a reference to a "crystal drug,"

another similar reference that he was "on drugs,"[14] and a later claim that he did not remember what happened yet knew "he snapped." But no evidence was presented to explain the effect of defendant's alleged mental illness on his mental state at the time of each murder, for example, whether he was responding to a delusion as in *McGehee* or had not appreciated the danger of his deadly acts. We therefore conclude there was insufficient evidence to support an involuntary manslaughter theory, even with the evidence of schizophrenia and voluntary intoxication.[15]

C.     *The Trial Court's Ruling Limiting Defendant's Argument Regarding Mental Impairment*

Defendant next contends the trial court improperly limited the scope of his closing argument and prevented him from arguing his theory of the case to the jury that mental illness negates implied malice. Specifically, he contends that the court "erred when it ruled that mental impairment evidence could only be used to negate express malice and could not be used to negate implied malice." He continues, the "court further erred when it

---

[14]     Evidence that the defendant was under the influence of drugs is irrelevant because voluntary intoxication is not admissible to negate implied malice. (§ 29.4.)

[15]     Having concluded that the trial court did not err when it did not instruct the jury on involuntary manslaughter, we reject defendant's contention that he should have been permitted to argue to the jury that he "acted with mere criminal negligence" and that "he should have been allowed to argue that he committed involuntary manslaughter and not murder." (*People v. Ponce* (1996) 44 Cal.App.4th 1380, 1390.)

21

ruled that [defendant] could not argue that 'he had no intent to kill' due to his mental illness because that would be an insanity defense." We disagree with defendant's characterization of the court's rulings.

We have reviewed defendant's record citations that purportedly include the trial court's ruling prohibiting defendant from arguing that his mental impairment negated implied malice. Defendant's citations do not support his assertion. To the contrary, in the portions of the transcript cited by defendant, the court discussed with defense counsel the propriety of delivering CALCRIM No. 3428, the mental impairment instruction upon which the parties later agreed. The court asked defense counsel, "so you're going to limit your arguments to this jury then to only to actuality? Whether he actually formed the specific intent or whether he premeditated it and deliberated it, period; correct? Okay. And you're shaking your head affirmatively?" Defense counsel agreed, "I am."

The trial court then made the comment, "I feel like in this particular case this implied malice aspect of the instruction, it's inapplicable in many ways because the nature of the killing, but I'm not suggesting that we take it out, but I want to know what you're going to do with regard to implied malice." Defense counsel replied that he had not yet fully formed his argument.

Consistent with section 28, subdivision (a), the trial court ruled that defendant could not argue that due to mental illness he lacked the *capacity* or *capability* to form specific intent, stating "I will close that argument down, any suggestion that he because he suffered from hallucinations and delusions, that he

22

was incapable of forming specific intent."[16]  The court did not, however, rule that defense counsel could not argue that defendant's mental impairment impacted his ability to act with malice during the killings.  Instead, the court gave CALCRIM No. 3428, as agreed to by defendant.  We therefore find no error.

---

[16]     As noted above in Part IV.B.1, the court correctly instructed the jury that it could consider evidence of hallucinations or delusions, but only in deciding whether the defendant acted with deliberation and premeditation, i.e., committed first degree murder, but not to negate malice aforethought.

## IV.   DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


                                        KIM (D.), J.


We concur:



HOFFSTADT, P. J.



MOOR, J.